In re MAXXAM, INC./Federated Development Shareholders Litigation.

NL INDUSTRIES, INC., et al., Plaintiffs,

v.

MAXXAM, INC., a Delaware corporation, MCO Properties, Inc., a Delaware corporation, Federated Development Co., a New York business trust, Charles E. Hurwitz, Barry Munitz, Ezra G. Levin, John M. Seidl, William C. Leone, and Stanley D. Rosenberg, Defendants.

Civ. A. Nos. 12111, 12353.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 21, 1994.
Decided: Feb. 10, 1995.
Revised: Feb. 13, 1995.

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, Wilmington, Silverman, Harnes, Obstfeld & Harnes, and Lowey, Dannenberg, Bemporad & Sellinger, New York City, for Shareholder plaintiffs.

A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, David C. McBride, of Young, Conaway, Stargatt & Taylor, and Lawrence C. Ashby, Stephen E. Jenkins, Richard D. Heins, and John S. Grimm, of Ashby & Geddes, Wilmington, for defendants.

Henry N. Herndon, Jr. and Bruce C. Doeg, of Morris, James, Hitchens & Williams, Wilmington, and Donald E. Scott and Lester C. Houtz of Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO, for NL Industries, Inc. et al., objector plaintiffs.

## OPINION

JACOBS, Vice Chancellor.

Pending is a motion to approve a proposed settlement of these shareholder derivative actions brought on behalf of MAXXAM, Inc. ("MAXXAM"), and its subsidiary, MCO Properties, Inc. ("MCOP"), both Delaware corporations. Named as defendants are MAXXAM, MCOP, certain MAXXAM directors,[1] and MAXXAM's controlling stockholder, Federated Development Company ("Federated").

The claims being settled arise out of two separate transactions that occurred in 1987 and 1991, respectively. In 1987, MCOP and Federated executed two loan agreements (the "1987 loans") whereby MCOP loaned Federated $25 million to further Federated's plans to develop certain land located in Rancho Mirage, California (the "Mirada"). MCOP later assigned its interest in those loans to MAXXAM. In 1991, after the loans had become nonperforming assets, MAXXAM was caused to purchase the Mirada from Federated in exchange for cancellation of the loans and other consideration totalling $43 million (the "1991 Mirada transaction"). Beginning in 1991, MAXXAM minority shareholders, including NL Industries, Inc. ("NL"), brought these derivative actions challenging both the 1987 loans and the 1991 Mirada transaction as the product of unfair self-dealing and fraudulent concealment in violation of the defendants' fiduciary duties.

In July 1994, the shareholder plaintiffs and the defendants entered into a Stipulation of Settlement and Release that is the subject of the pending motion. Under the proposed settlement, all claims arising out of the 1987 loans and the 1991 Mirada purchase would be released, and all actions asserting those claims would be dismissed, in exchange for payments totalling $3 million. The settlement is, however, vigorously opposed to by plaintiffs NL, a New Jersey corporation, and its chairman, Harold C. Simmons (collectively, the "NL Plaintiffs"). The NL Plaintiffs, who have vigorously prosecuted their claims

---

1. The director defendants are Charles E. Hurwitz, Barry Munitz, Ezra G. Levin, John M. Seidl, William C. Leone, Stanley D. Rosenberg and the late John B. Connally and C.V. Wood, Jr. The deaths of Mr. Wood and Governor Connally led to their dismissal as named defendants.

in this Court and later in Texas, own about 14% of MAXXAM's outstanding common stock and are MAXXAM's largest nonmanagement shareholders.

A hearing on the motion to approve the settlement took place on September 21, 1994. This is the Opinion of the Court on the settling parties' motion to approve the settlement. Given the undisputed facts of record, the Court regrettably must deny that motion.

## I. *PROCEDURAL BACKGROUND*

An understanding of the issues presented requires a somewhat extended recital of the procedural background of these stockholder derivative actions.

The first action was filed on May 28, 1991. The NL Plaintiffs filed a separate action on November 13, 1991 (the "NL Delaware Action"), and other derivative actions followed thereafter. These lawsuits were consolidated on February 3, 1992 (the "Consolidated Action"), except for the NL Delaware Action which was at all times separately and independently prosecuted.

The complaint in the NL Delaware action charged Federated and MAXXAM's directors with breaches of fiduciary duty arising out of the 1991 Mirada purchase transaction. The NL Plaintiffs sought rescission of that transaction and money damages. Federated moved to dismiss the NL Delaware Action as to it for lack of personal jurisdiction. That motion was granted on April 8, 1992. In response, the NL Plaintiffs filed a substantially identical derivative action in a Texas state court (the "NL Texas Action") where *in personam* jurisdiction over Federated was available.

On February 28, 1992, the shareholder plaintiffs filed a consolidated complaint against MAXXAM, MCOP, Federated, and certain MAXXAM directors. That complaint charged Federated with having breached its fiduciary duties to MAXXAM by mismanag-

ing the development of the Mirada, and it charged the individual defendants with breaches of duty for having approved the 1991 Mirada purchase. The shareholder plaintiffs prayed that the Mirada transaction be rescinded and that Federated and the individual defendants be required to account to MAXXAM.

On January 22, 1993, the shareholder plaintiffs moved for leave to file a Second Amended Complaint, to add new claims based upon the 1987 loans. The defendants opposed that amendment on the ground that any claims arising out of those loans were barred by the statute of limitations. In an Opinion dated April 13, 1993, this Court denied the shareholder plaintiffs' motion for leave to amend their complaint. *In re MAXXAM, Inc./Federated Dev. Shareholders Litig.; N.L. Indus., Inc., et al. v. MAXXAM, Inc., et al.*, Del.Ch., C.A. Nos. 12111 and 12353, 1993 WL 125533, Jacobs, V.C. (April 13, 1993). The Court did, however, grant the shareholder plaintiffs leave to file an amended complaint to plead facts that would operate to toll the statute of limitations. *Id.* at 7–8.[2]

On April 22, 1993, the shareholder plaintiffs filed a Third Amended Complaint alleging facts that (those plaintiffs claimed) operated to toll the statute of limitations because material information relating to the 1987 loans had been concealed from MAXXAM's public shareholders. The shareholder plaintiffs sought rescission of both the 1987 loans and the 1991 Mirada transaction, as well as an accounting by Federated to MAXXAM and MCOP.

The defendants again moved to dismiss the 1987 loan claims as barred by the statute of limitations. Before briefing on that motion was completed, the shareholder plaintiffs and the defendants entered into the settlement agreement now *sub judice*, and on July 7, 1994, those parties formally moved for its

---

**2.** The Court concluded that it was unable to determine whether the 1987 loan claims were time barred, because the record was insufficiently developed. However, because the complaint suggested that certain potentially material facts relating to the 1987 loans might have been withheld from MAXXAM'S public shareholders before

1991, the Court granted the plaintiffs leave to file a further amended complaint "alleging facts that, if true, would invoke the tolling principle." *In re MAXXAM, Inc./Federated Dev. Shareholders Litig. N.L. Indus., Inc., et al. v. MAXXAM, Inc., et al.*, Del.Ch., C.A. Nos. 12111 and 12353, 1993 WL 125533 Jacobs, V.C. (April 13, 1993).

approval. As a result, the limitations defense to the 1987 loan claims remains judicially unresolved.

Under the proposed settlement agreement, all claims that were or could have been asserted in the Consolidated Action, in the NL Delaware Action, and in the NL Texas Action, would be released. The settling parties seek that result despite the NL Plaintiffs' objection that they were never consulted in advance about, or given an opportunity to bargain over, the release of their claims. To implement the settlement, Federated—which had objected successfully to this Court asserting *in personam* jurisdiction over it—has now agreed to submit to that jurisdiction by stipulating to its reinstatement as a defendant in these actions. That was accomplished by the shareholder plaintiffs filing a Fourth Amended Complaint that (*inter alia*) added Federated as a party defendant. The sole purpose of that latest pleading was to serve as the vehicle to accomplish the settlement.

In consideration for the release of those claims, (i) the individual defendants would pay MAXXAM $1.5 million, and (ii) Federated would pay MAXXAM an additional $1.5 million over five and a half years in 22 quarterly payments of approximately $68,200 each.[3]

## II. *RELEVANT FACTS*

MAXXAM and MCOP (a former wholly owned MAXXAM subsidiary) are Delaware corporations with principal places of business in Houston, Texas. Federated, a New York business trust, also has its principal place of business in Houston. Federated owned a controlling interest in MAXXAM, and Federated, in turn, was 100% owned by defendant Charles Hurwitz ("Hurwitz") and members of his family and family trusts. Hurwitz was the Chairman of the Board and the Chief Executive Officer of both Federated and MAXXAM.

Since the early 1970s, Federated had owned a tract of land in Rancho Mirage,

California, and an adjacent property in Cathedral City, California. Those properties, which would later become known as the "Mirada," are located on a mountain ridge that rises above Rancho Mirage. Federated had a long-term plan to develop the Mirada. In furtherance of that plan, Federated invested over $12 million to prepare the project, and entered into a joint venture to construct a Ritz–Carlton Hotel on adjacent land.

### A. *The 1987 Loans*

In the mid 1980s, Southern California was experiencing a "boom market" for high-end resort real estate. During that period Federated searched for an investor to help finance the further development of the Mirada. Federated contacted and had discussions with several financial institutions. Apparently not satisfied with the financing terms being offered, Federated then approached its controlled subsidiary, MAXXAM, for debt financing.

On June 15, 1987, MAXXAM's board of directors met to consider Federated's loan proposal. Hurwitz presided over that meeting, and Dr. Barry Munitz—a MAXXAM director and Federated's President who was acting on Federated's behalf—presented and advocated Federated's proposal to the MAXXAM board.

Dr. Munitz presented two documents specially prepared by Federated-retained experts. The first was a letter from a real estate appraiser, Harry J. Blee of M.A.I. (the "Blee Study"), that contained a preliminary valuation of the Mirada which ranged between $34 and $38 million. The second document was a "market validation study" prepared by Robert Charles Lesser & Co. (the "Lesser Study"), that compared the Mirada's amenities and features with those offered by other high-end residential resorts in the area. The Lesser Study concluded that the Mirada project was well positioned for success in that market.

---

**3.** Although the settling parties value the settlement at $3 million, in fact the value is less, because of the need to discount to present value the stream of quarterly payments totalling $1.5 million over a 5½ year period. The record does not disclose what that discounted value would be.

At the June 15 meeting the MAXXAM board approved the 1987 loans in principle, subject to two conditions: (a) the formal completion of the Blee and Lesser Studies; and (b) confirmation from MAXXAM's real estate, accounting, and legal advisors that the assumptions underlying those studies supported a decision to develop the Mirada. Both conditions were subsequently satisfied, and the 1987 loans (as described below) were made.

The first loan agreement—executed by MCOP in August 1987—called for MCOP to loan $15 million to Federated over a five-year term at 12% annual interest (the "First Term Loan"). That loan agreement also provided for a separate $5 million, five-year revolving credit line at the prime rate plus 1% (the "Line of Credit"). As further consideration for these loans, MCOP was granted a 25% interest in the net profits realized from Mirada lot sales, plus the right to participate in any further development of the Mirada that Federated decided to undertake.

Importantly, however, these $20 million of loans to Federated were non-recourse. They were secured only by a deed of trust on 62 acres of the Mirada that had been set aside for residential development (the "Phase I" lots). Although Federated was expressly precluded from using the Line of Credit loan proceeds for any purpose other than improving the Mirada, Federated's use of the $15 million First Term Loan proceeds was not so clearly restricted. The loan agreement did not require that interest be paid currently; instead it permitted interest to accrue. Although interest and principal on the First Term Loan had to be paid from the net proceeds of sales of lots to developers or other buyers, Federated was entitled to draw directly upon those proceeds, rather than being required to draw upon the Line of Credit. As a result, Federated had the right to control the disposition of the fund that was the only source from which that loan could be repaid.

In November 1987 MAXXAM granted the "Second Term Loan" to Federated on the following terms: MCOP [4] agreed to extend an additional $3 million term loan, and (under specified conditions), a $2 million third term loan. Interest on both loans was to be at 1% over the prime rate. The Second Term Loan (like the First Term Loan) would also fall due in five years, and principal and interest were to be paid from the proceeds of the sale of Mirada parcels for development. The Second Term Loans were also nonrecourse, and were secured solely by a deed of trust to a 1,028 acre parcel of land in Cathedral City that was to be developed as a golf course (the "Cathedral City Parcel"). The Second Term Loan proceeds were to be used to reimburse Federated's cost of acquiring the Cathedral City Parcel. There was no requirement that those proceeds be used to enhance the Parcel's value.

Over the next four years, until the Mirada was sold to MAXXAM in 1991, Federated experienced setbacks in its effort to develop its Rancho Mirage holdings. In April 1988, Federated began constructing a golf course on the Cathedral City Parcel. The City of Rancho Mirage objected, and sued to enjoin the construction of the golf course and the Mirada residential development. That litigation was settled in early 1989, as follows: Federated abandoned its plan to develop the golf course and donated most of the 1,028 acre Cathedral City Parcel—MAXXAM's security for the second set of loans—for use as a preserve for Big Horn sheep. The City of Rancho Mirage, in turn, withdrew its objection to the development of the Phase I lots at the Mirada, and permitted Federated to develop the remainder of the Cathedral City Parcel for residential purposes, including sites for villas and townhomes and single family structures (the "Phase II" lots).

Another setback that retarded the development of the Mirada was a downturn in the Southern California real estate market. Between 1988 and 1991, Federated was unable to attract any buyers or co-venturers interested in developing the villa or townhome sites. In addition, the pace of lot sales of the Phase I residential site was much slower than projected. As a result, by the time Federated sold the Mirada to MAXXAM in May 1991, the unpaid principal and accrued

4. As earlier noted, MCOP assigned its interest in the 1987 loans to MAXXAM.

interest on the combined 1987 loans totalled approximately $34 million.

## B. *The 1991 Mirada Transaction*

In this adverse environment—a depressed Southern California real estate market, lagging sales of residential lots at the Mirada, no prospects for the development of the villa and townhome sites, and mounting unpaid principal and interest on the 1987 loans— Federated again approached MAXXAM in the fall of 1990 and asked it to consider acquiring outright the Mirada and Federated's other Rancho Mirage properties.[5] At a MAXXAM board meeting held on November 6, 1990, a Special Committee of five MAXXAM directors was formed to consider Federated's proposal.[6] To assist the Committee in that endeavor, four separate experts (three real estate firms and one investment banking firm) were retained to opine on various aspects of the Mirada transaction.

At a December 13, 1990 meeting, the Special Committee ratified a decision previously made by Governor Connolly, to retain Cushman & Wakefield, a real estate firm, to appraise the Mirada. The minutes of that meeting, which describe the process by which Cushman & Wakefield was selected, indicate that the Committee members interviewed representatives from Cushman & Wakefield and two other firms, and later eliminated one firm from consideration. (Defs. Ex. 24 at 7–8). According to those minutes, Governor Connolly, as Committee chairman, then selected Cushman &·Wakefield over the other remaining candidates. (*Id.* at 8).[7]

In its final report issued on March 27, 1991, Cushman & Wakefield valued the Mirada at approximately $43 million—the amount MAXXAM ultimately paid for that property. (NL Ex. 24 at Cover Letter). Important findings contained in its report, however, do not support that firm's $43 million valuation. Cushman & Wakefield assumed a certain pace ("absorption rate") of lot sales and price projections that, given the report's highly negative assessment of the underlying market conditions and the Mirada's ability to compete with other resorts in that area, appeared highly optimistic.

Specifically, Cushman & Wakefield assumed that (a) Federated would realize its full asking price, in cash, for each lot, (b) the project would be marketed for nine to twelve months, and (c) the Phase I and Phase II single family lots would be sold out by October 1996. (*Id.* at 4–5, 52–53). However, Cushman & Wakefield found that "no lots are in escrow as of the mid point peak season; this indicates historic absorption levels have not been maintained." (*Id.* at 17). The firm also found that the lack of golf course access for Mirada residents and the presence of the Ritz–Carlton Hotel were "viewed as a considerable marketing constraint" in the Palms Springs area. (*Id.* at 19–20). Other findings were that the Southern California real estate market was oversupplied with finished lots and land, that price reductions of 20% to 25% on finished lots were common, and that financing for real estate purchases had all but disappeared, thereby forcing many buyers out of the market. (*Id.* at 34–35). Finally, Cushman & Wakefield concluded that the upper end of the market (the

---

**5.** The MAXXAM board decided to consider acquiring only the Mirada residential sites, not Federated's other Rancho Mirage properties.

**6.** The five members of the Special Committee were: (i) former Texas Governor John Connally, the chairman; (ii) John Seidl, President of MAXXAM, and Chairman and CEO of Kaiser Aluminum, another Hurwitz controlled entity; (iii) William Leone, a former President of MAXXAM who was then under a one-year consulting contract with another MAXXAM subsidiary; (iv) C.V. Wood, a former President of MAXXAM who was receiving deferred compensation from the company; and (v) Stanley Rosenberg, a long-time associate of Hurwitz, with whom Rosenberg had entered into several business ventures.

**7.** The scenario portrayed by MAXXAM's minutes—the formation of the Special Committee followed by the Committee's choice of Cushman & Wakefield through an open selection process— does not square with Cushman & Wakefield's own March 27, 1991 final report, which states that Cushman & Wakefield "originally commenced [the appraisal] in late October, 1990, the time of our inspection of the subject." (NL Ex. 24 at 3). If that is accurate, then Cushman & Wakefield was first asked to begin work on its appraisal of the Mirada over a week before the Special Committee was formed, and over six weeks before the Committee ratified Governor Connolly's selection of that firm.

niche at which the Mirada was aimed) had been most adversely affected, and that if there were a real estate recovery, other projects in the area would provide stiff competition. (*Id.* at 35–36).

Apparently concerned about Cushman & Wakefield's findings, the Special Committee met on March 15, 1991 to consider an "absorption rate" study that had been conducted by KPMG Peat Marwick, a second firm the Committee had retained. KPMG Peat Marwick opined that to achieve the absorption rates assumed by Cushman & Wakefield, the Mirada would have to be much more aggressively marketed. KPMG Peat Marwick's findings were similarly critical of the Mirada as a development project. Those findings were that: (1) the Mirada lacked amenities, especially a golf course, that it could offer to potential buyers; (2) the project's landscape design was inferior to those of competing projects; (3) the security wall was inadequate; (4) the slow lot sales reflected that the earlier sales program had failed to create the image of the Mirada as a "premier community;" (5) current lot prices were too high when compared to competing projects; (6) to sell all the lots at those price levels would take from 8 to 20 years; and (7) the builder market for lots had dried up because of unfavorable prices and capital markets. According to KPMG Peat Marwick, some of these problems could be remedied by lowering lot prices and by marketing the project more aggressively.

On April 17, 1991, the Special Committee met to consider the views of a third firm, Lewis & Howard, which criticized both Cushman & Wakefield and KPMG Peat Marwick's valuation assumptions as unduly pessimistic and conservative. The Special Committee also heard from a representative of First Boston—the fourth expert firm the Committee retained. First Boston's representative opined that even though he did not agree with Cushman & Wakefield's appraisal in its entirety, Cushman & Wakefield's valuation of the Mirada was plausible even though that valuation fell at the high end of a reasonable range of values. Finally, First Boston reported that its own valuation of the Mirada ranged between $35.6 and $45.9 million.

The Committee then decided to proceed with the Mirada purchase. Despite the problems flagged in the Peat Marwick study, the internal inconsistencies in the Cushman & Wakefield appraisal, and the fact that in only one year MAXXAM would be entitled to foreclose upon (and thereby acquire ownership of) its collateral, the Mirada, at a much lower price, the Special Committee authorized the purchase of the Mirada at Cushman & Wakefield's $43 million appraised value.

On May 13, 1991, the Special Committee met to review the proposed purchase agreement, whose terms were as follows: (1) MAXXAM would forgive the $34 million of unpaid principal and accrued interest owed by Federated on the 1987 loans; (2) MAXXAM would assume a $2 million obligation of Federated to a third party, and would advance Federated another $1.4 million to buy out another third party investor; (3) MAXXAM would issue to Federated shares of MCOP preferred stock, valued by First Boston at $3.9 million; and (4) MAXXAM's 25% contingent interest in project profits (valued at $1.3 million) would be extinguished. Thus, the consideration MAXXAM would pay for the Mirada totalled approximately $43 million.

The Committee unanimously approved the purchase of the Mirada on those terms. There is no evidence that the Special Committee ever attempted to bargain for a lower price.

### III. *THE PARTIES' CONTENTIONS*

The settlement proponents—who are all the parties to these actions except for the NL Plaintiffs—contend that the settlement is fair and reasonable and should be approved. They assert that no viable legal claims can be asserted with respect to the 1987 loans because such claims are time-barred and lack substantive merit. They also contend that the legal challenge to the 1991 Mirada transaction is without substantive merit, or, alternatively, that the value of those claims is so insignificant as to render the $3 million settlement fair consideration for their dismissal, particularly when the risk and cost of further litigation is taken into account.

The NL Plaintiffs object that the settlement proponents have not met their burden of proving that the settlement proposal is fair and reasonable. They maintain that the settlement proponents have grossly undervalued the claims being settled, because (i) the claims arising out of the 1987 loans are viable and meritorious, and (ii) the settling parties have understated the potential recovery on the 1991 Mirada transaction claims. The NL Plaintiffs contend that since Federated and Hurwitz stood on both sides of the challenged transactions, at a trial the defendants would have the difficult burden of proving that the transactions were entirely fair. The NL Plaintiffs conclude that because the settlement proponents have not shown that they would be able to meet that burden, the proposed settlement must be disapproved.

## IV. THE APPLICABLE REVIEW STANDARD AND BURDEN OF PROOF

 The burden of persuading the Court that a settlement proposal is fair and reasonable rests upon the settlement proponents. *Barkan v. Amsted Indus., Inc.*, Del. Supr., 567 A.2d 1279, 1285–86 (1989); *Lewis v. Hirsch*, Del.Ch., C.A. No. 12532, Hartnett, V.C., mem. op. at 7, 1994 WL 263551 (June 1, 1994). In determining whether to approve a settlement of a shareholder derivative action, the Court must "look to the facts and circumstances upon which the claim is based, ... the possible defenses thereto, and ... then exercise its own business judgment ... [to] determine the overall reasonableness of the settlement." *Rome v. Archer*, Del.Supr., 41 Del.Ch. 404, 197 A.2d 49, 53–54 (1964). In performing that task, the Court must balance the strong policy favoring the settlement of such suits, *Polk v. Good*, Del.Supr., 507 A.2d 531, 535 (1986), against the policy of ensuring that the interests of shareholders are proper-

ly protected. *Barkan*, at 1283. That balancing function is informed by six factors:

(1) the probable validity of the claims; (2) the apparent difficulty of enforcing the claims through the Courts; (3) the collectibility of any judgment; (4) the delay, expense and trouble of litigation; (5) the amount of the compromise as compared with the amount and collectibility of the judgment, and (6) the views of the parties involved, pro and con.

*Polk*, at 536.

Of these factors, the second and third are not in issue in this case.[8] Although the settlement proponents argue that continued litigation would be costly and time-consuming, significant discovery has already occurred. Thus, any incremental expense and delay from continued litigation would not likely generate disproportionate incremental cost or inconvenience. Accordingly, this motion turns critically upon the first and fifth *Polk* factors, namely, (i) the probable validity of the 1987 loans and 1991 Mirada transaction claims and (ii) the estimated value of a favorable judgment on those claims.[9]

The highest value any party attributes to the 1991 Mirada transaction claims is $7.3 million.[10] If (*arguendo*) the 1987 loan claims were not valid (*i.e.*, worth $0), and if the claimed $7.3 million value of the Mirada claims were discounted for the risk of litigation and then compared to the (undiscounted) $3 million consideration, the proposed settlement would likely be found fair and reasonable. But to say that is only to highlight the critical question, which is whether the settling parties were correct in assigning no ($0) value to the 1987 loan claims. That $0 valuation rests on the premise that the loan claims are either barred by the statute of limitations or have no substantive merit. If that premise is valid, then (to repeat) the settlement proposal would likely be found adequate and the analysis could end at that point.

**8.** No issue is raised as to the Court's ability to enforce a judgment on any of the claims before it, nor is it argued that a judgment would not be collectible.

**9.** Exploration of the sixth factor (the views of the parties) is subsumed in the analysis of the first and fifth factors.

**10.** The NL Plaintiffs so contend. The settlement proponents value the 1991 Mirada at between $3.9 million (contended for by the Shareholder Plaintiffs) and $5.3 million (argued by the defendants).

But if the settling parties are not correct—that is, if the 1987 loan claims do have probable substantive merit and are not clearly time-barred—the Court would next address the 1991 Mirada transaction claims. If those latter claims were found to have probable validity, the Court would then consider the potential value to the plaintiffs of a judgment on all claims and then, lastly, would compare the estimated value of that judgment to the value of the settlement proposal.

To state the matter in a different way, for the settlement proponents to discharge their burden of persuasion on the pending motion, they must show either that (i) the 1987 loans are, more likely than not, invulnerable to legal attack, or (ii) if those claims are valid, that the combined value of the loan claims and the 1991 Mirada transaction claims is sufficiently small as to render the proposed settlement fair and reasonable. Those contested propositions frame the issues to be decided on this motion.

In Part V, *infra*, of this Opinion, the Court addresses the probable validity (for settlement purposes) of the 1987 loan claims; in Part VI, it determines the probable validity of the 1991 Mirada transaction claims, and in Part VII, it considers the value of those claims in relation to the amount being offered in settlement.

## V. PROBABLE VALIDITY OF THE 1987 LOAN CLAIMS

The defendants advance three arguments to support their position that the 1987 loan claims have no ($0) settlement value. First, they argue that the claims are barred by the statute of limitations. Second, they contend that even if the claims are not time-barred, the MAXXAM directors' approval of the 1987 loan transactions is entitled to the protection of the business judgment standard of review.

Third, the defendants claim that even if the business judgment review standard does not govern, the loan transactions nonetheless survive scrutiny under the entire fairness standard. I address these arguments in that sequence.

### A. *The Limitations Defense*

■■■■ The first question is whether the shareholder plaintiffs [11] would more likely than not be barred by the statute of limitations from bringing the 1987 loan claims. The applicable statute is 10 *Del C.* § 8106, a three-year statute of limitations. Courts of equity do not normally apply statutes of limitations directly but because equity follows the law, this Court will, in appropriate circumstances, apply the statute of limitations by analogy. *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 276 (1993). The Court will also, in appropriate cases, apply the doctrine of equitable tolling under which the running of the limitations period "is tolled in derivative actions charging actionable self-dealing, until the shareholders knew or had reason to know of the facts constituting the alleged wrong." *Id.* A plaintiff who contends that the limitations period is tolled has the burden of pleading specific facts that establish tolling. *In re USACafes, L.P. Litig.,* Del.Ch., Cons.C.A. No. 11146, Allen, C., mem. op. at 5, 1993 WL 18769 (Jan. 21, 1993).

■■■■ The 1987 loan claims charge the defendant fiduciaries with actionable self-dealing. Because the first of these derivative actions was filed on May 28, 1991—after the three-year limitations period had expired—unless tolling had occurred, the claims arising out of the 1987 loans would by then have been time-barred.

The defendants contend that the running of the statute had not been tolled before the

---

11. No one disputes that the NL plaintiffs lack standing to challenge the First and Second Term Loans, because they were not MAXXAM shareholders at the time those loans were made. The defendants argue that the NL plaintiffs lack standing to object to the settlement of the 1987 loan claims, citing *Leighton v. Lewis,* Del.Supr., C.A. No. 471, 1990 WL 84704, Christie, C.J. (May 25, 1990) (ORDER). In *Leighton* the Delaware Supreme Court ruled that a plaintiff who lacked original standing to bring a derivative action could not challenge a Court-approved settlement of that action on appeal. *Id.* at 3. The defendants' argument does not advance their position, because the shareholder plaintiffs have undisputed standing to challenge the 1987 transaction, even if the NL Plaintiffs do not. Therefore, this Court is free to determine the viability and value of those claims for settlement purposes, unconstrained by the shareholder plaintiffs' present litigating position that those claims have no significant *settlement value.*

commencement of the first action, because MAXXAM's public filings during the preceding three-year period constituted actual or constructive notice of any potentially unfair terms in the 1987 loan agreements. As support, the defendants point to the description of the key loan terms found in certain MAXXAM disclosure documents, all published on or before February 11, 1988, including a Form 10–Q, an Annual Report, and a Joint Proxy Statement and Prospectus.

I find this argument unpersuasive. The Third Amended Complaint alleges that the defendants concealed material facts relating to three important aspects of the 1987 loans. The first was the degree of risk associated with the Mirada project. In that connection it is alleged that the defendants did not disclose that when the 1987 loans were made the Mirada was a failing project, that after ten years there was not even one recorded estate lot sale, and that there was significant local opposition to the project's completion. (Consolidated Third Amended Complaint, ¶¶ 12, 15).

The second allegedly concealed material fact was that Federated's ability to pay current interest on the loans was in serious doubt. MAXXAM's publicly filed 1988 disclosure documents represented that the Mirada had been subdivided to allow improvements with single family homes, townhouses and condominiums, and that under the loan agreements, interest would be paid out of the proceeds from the sales of those lots. The Complaint alleges, however, that (i) those documents did not disclose that no lots had yet been sold, and that (ii) disclosure documents disseminated by MAXXAM in 1989 and 1990 concealed the fact that proceeds from the sale of 15 estate lots had been reloaned to Federated instead of being used to pay interest currently due on the original loans, with the result that interest was continuing to accrue. (*Id.* at ¶¶ 12, 14).

Finally, the Third Amended Complaint alleges that the defendants' 1988 disclosures concealed that the proceeds from the First Term Loan had been paid to Hurwitz rather than being used to develop the Mirada. That nondisclosure is claimed to be material, because "stockholders could reasonably assume that provisions of the [first] Term Loan required the Loan proceeds to be invested in the Mirada project," and that "[s]uch provisions are routine in development and construction loans in order to enhance the collateral and thereby provide additional security for the loan." (*Id.* at ¶¶ 12–13).

The Shareholder Plaintiffs claim in their Third Amended Complaint that these allegations, if true, were sufficient to establish that because of those concealments it was not until 1992, during discovery, that facts indicating the substantive unfairness of the 1987 loans first came to light. Thus, while MAXXAM's public filings may have disclosed that the 1987 loans were self-dealing in character, they did not disclose (but concealed) facts that would have alerted shareholders to the possibility that the loans were also substantively unfair. I find that position to have plausible merit.

The defendants reply that MAXXAM's public disclosures made in early 1988 put its shareholders on notice of any potential fiduciary claims arising out of the 1987 loans. However, that argument rests upon an implicit proposition that once the self-dealing character of the loans was publicly disclosed, that disclosure constituted notice sufficient to impose an affirmative duty on the shareholders to investigate further the specific terms, circumstances, and management of the loan agreements. Stated differently, the defendants argue that the statute of limitations began to run once the loan terms were publicly disclosed, and from that point forward MAXXAM's public shareholders were obligated to investigate the transactions for possible unfairness or face the risk of being time-barred from challenging them.

In my view, *Kahn v. Seaboard Corp., supra,* invalidates that proposition. There this Court held that:

> In functional terms there are good reasons why a corporate stockholder ought to be treated differently than a plaintiff who is a stranger to the defendant from whom he seeks compensation for a tort.... The corporate shareholder commits capital to the supervision and management of the corporate board. In doing so the stockholder becomes dependent upon the skill

and loyalty of those in control of the corporate enterprise. Legally sanctioned relationships of dependence and trust are important for the law to enforce for both instrumental and expressive reasons. Given the fiduciary duties that the law imposes upon the relationship among those serving as corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes....

Since trust and good faith are the essence of this relationship, it would be corrosive and contradictory for the law to punish reasonable reliance on that good faith by applying the statute of limitations woodenly or automatically to alleged self-interested violations of trust.

625 A.2d at 275. *See also Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, Del.Ch., 532 A.2d 1324, 1339 (1987).

To decide this motion, the Court need not definitively resolve these colliding arguments. *Rome v. Archer*, 197 A.2d at 53–54. The settlement proponents are the parties that bear the burden of persuasion. They have not persuaded me that MAXXAM's public shareholders had notice since 1988 of all material facts that underlie the Third Amended Complaint. Therefore, I cannot conclude, on the present record, that the 1987 loan claims would more likely than not be time-barred.

### B. *The Appropriate Standard of Review*

The next inquiry concerns the probable substantive merit of the loan claims. In conducting that inquiry, the Court must first determine under what standard of review those claims would likely be evaluated. If the 1987 loan transactions were reviewed under the business judgment standard, the defendants' burden would not be onerous, because under that standard, absent a demonstrated breach of the duty of care or loyalty, the transactions would be upheld if they could be attributed to any rational business purpose. *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 634 A.2d 345, 361 (1993). If, on the other hand, those transactions were re-

quired to be reviewed under the entire fairness standard, then the defendants' burden would be substantially greater because the defendants would have to establish that the transactions were entirely fair to MAXXAM. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 703 (1983). Thus, it is more likely that the proposed settlement would be approved if business judgment were the applicable standard of review than if the review standard were entire fairness.

The defendants argue that at a hearing on the merits the business judgment review standard would govern, because (i) the 1987 loans were approved by a majority of disinterested and independent MAXXAM directors, (ii) that approval was based upon information furnished by independent experts, and (iii) the loan terms were comparable to those being offered third party lenders. The NL plaintiffs sharply disagree. They contend that the loan transactions, given their self-dealing nature, would probably be evaluated under the more demanding entire fairness review standard. I concur.

▮▮▮ A shareholder that owns a majority interest in a corporation, or exercises actual control over its business affairs, occupies the status of a fiduciary to the corporation and its minority shareholders. *Kahn v. Lynch Communication Systems, Inc.*, Del. Supr., 638 A.2d 1110, 1113 (1994). And where a shareholder owing such fiduciary duties stands on both sides of a challenged transaction, it will be required to demonstrate that the transaction was entirely fair to the corporation. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937 (1985); *Weinberger*, at 710. Federated was MAXXAM's controlling shareholder,[12] and as such owed fiduciary duties to both MAXXAM and its minority stockholders. *Lynch Communication*, at 1113. Because the 1987 loans to Federated were made by MAXXAM, Federated clearly stood on both sides of those transactions. Therefore, at a trial Federated would be required to demonstrate that the 1987 loan transactions were entirely fair. *Id.* at 1115; *Weinberger*, at 710.

---

**12.** When the challenged loan transactions were consummated in 1987, Federated controlled 64.2% of the voting power of MAXXAM's predecessor, MCO Holdings, Inc.

The question then becomes whether the defendants would be able to so demonstrate. That inquiry requires an exploration of the substantive terms of the 1987 loans and the process that led to their approval.

## C. *The Fairness of the 1987 Loans*

An entire fairness review mandates inquiry into "issues of fair dealing" and "fair price." *Weinberger,* at 711. Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how [approval] was obtained." Fair price "relates to the economic and financial considerations of [the transaction]...." *Id.* Based on the present record, I conclude that the 1987 loans are vulnerable to legal attack in both of these respects.

The NL Plaintiffs contend that the operating history of the Mirada project, the high risk associated with its future development, and the fact that MAXXAM bore most of that risk, made the loans economically unfair to MAXXAM. They emphasize that when the loans were made in 1987 the Mirada project had been underway for ten years, yet no lots had been sold. Moreover, the project had not yet gained final approval from the City of Rancho Mirage and local opposition to the project was firmly entrenched. In those circumstances, the NL Plaintiffs argue, the basic terms of the 1987 loans—nonrecourse, no current interest payments required, no condition that all loan proceeds be used to enhance the value of the Mirada, and no restriction upon Federated's control over the Mirada's development— were unfair to MAXXAM because they loaded onto MAXXAM 100% of the risk, yet gave MAXXAM very little (25%) of the project's upside potential in return.

The defendants offer a multifold response. They contend that Federated pursued the loan transactions with MAXXAM only after it had investigated the terms offered by other prospective lenders, which (defendants assert) were comparable. The defendants also argue, in reliance on *In re Fort Howard Corp. Shareholders Litig.,* Del.Ch., Cons.C.A. No. 9991, 1988 WL 83147, Allen, C. (Aug. 8, 1988), that their investigation and negotiations with at least two third party lenders operated as a "market check" that presumptively established the fairness of the loan terms.

This argument labors under a dual burden. First, it lacks sufficient factual support. The only evidence supporting the defendants' assertion that the 1987 loan terms were comparable to those offered by third party lenders, is the self-serving deposition testimony of Dr. Munitz, the President of Federated. No documentary record evidence was submitted to corroborate that testimony, and indeed, during discovery the NL Plaintiffs requested the production of corroborating documents, but the defendants declined to produce them.

Second, the defendants' so-called "market check" bears no resemblance to the process validated by this Court in *Fort Howard.* In that case, members of a corporation's senior management had joined with an entity formed by Morgan Stanley Group, Inc. to make a tender offer for all of the corporation's outstanding shares. *Fort Howard,* at 1. The special committee of directors that negotiated on the corporation's behalf did not conduct an auction. However, it did negotiate a contractual post-agreement, pre-closing "market check" procedure designed to test whether the negotiated tender offer price was fair. *Id.* at 3. The press release that announced the transaction disclosed that although the special committee had unanimously endorsed the Morgan–Stanley/management tender offer, the corporation would entertain (but not solicit) competing proposals for a specified period. The "market check" process then ensued *after* the negotiations with the management-affiliated buyout group had been concluded, but before the tender offer closed, *Id.* at 15–23. The Chancellor found that that process confirmed the fairness of the negotiated tender offer price. *Id.* at 31–33.

Here, in contrast, Federated first contacted third party commercial lenders and *then* approached its controlled subsidiary, MAXXAM, to obtain the loans. That sequence of events suggests that Federated first ascertained what loan terms would be commercially available and then obtained more favorable

terms from MAXXAM. That pejorative (but plausible) scenario finds support in the absence of any evidence that arms-length negotiations over the loan terms ever took place. Indeed, it appears that MAXXAM accepted the precise loan terms proposed by Federated. Had the MAXXAM board followed the *Fort Howard* model, then Federated would first have negotiated the loan agreements with MAXXAM, and thereafter, a special committee of disinterested and independent MAXXAM directors would have conducted a post-agreement, pre-closing investigation to test whether those loan terms were fair in relation to the best terms available in the commercial loan market.

The defendants next argue that the Lesser and Blee studies evidence the fairness of the loan agreements, because those studies concluded that the value of the property used as security far exceeded the amount of the loans. That is incorrect. Those studies did opine as to the value of the Mirada and the prospects for the Southern California resort real estate market. However, they did not address the fairness of the loan terms to *MAXXAM*. Moreover, both studies were commissioned by Federated, and, consequently, would not be entitled to the same degree of evidentiary credit that would be accorded to studies commissioned by MAXXAM's independent directors.

For these reasons the defendants have failed to persuade me that at a trial they would be able to demonstrate that the 1987 loans were, more likely than not, entirely fair to MAXXAM.

## VI. *PROBABLE VALIDITY OF THE 1991 MIRADA TRANSACTION CLAIMS*

### A. *Standard of Review*

█ I now turn to the 1991 Mirada transaction claims, inquiry into which must begin with the standard of review that would likely govern at a trial. Again, if the 1991 Mirada transaction were required to be evaluated under the business judgment standard, the defendants' burden of persuasion would be far less onerous than if the transaction were to be scrutinized under the entire fairness standard.

It is undisputed that Charles Hurwitz, through his control of Federated, controlled MAXXAM, its board of directors, and its subsidiaries. It is also undisputed that MAXXAM's controlling shareholder, Federated, sold the Mirada to MAXXAM. Thus, as with the 1987 loans, Federated was a fiduciary that stood on both sides of the challenged transaction.

The defendants do not dispute that. What they contend is that the business judgment standard of review still would govern because the Mirada purchase was approved by a Special Committee of MAXXAM directors having no economic interest in the transaction. I agree that none of the Special Committee members was shown to have a conflicting financial interest in the 1991 Mirada transaction.[13] However, the record does establish a substantial likelihood that a majority of the Committee's members were not independent of Hurwitz. Accordingly, I cannot accept the defendants' position that if the 1991 Mirada claims were tried, the business judgment standard of review would apply.

To be considered independent, a director must not be "dominated or otherwise controlled by an individual or entity interested in the transaction." *Grobow v. Perot*, Del. Supr., 539 A.2d 180, 189 (1988). The burden of proving director non-independence rests upon the party challenging the transaction. *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984); *Grobow*, at 188. To establish non-independence, the plaintiffs would have to show that the MAXXAM directors were "beholden" to Hurwitz or "so under [his] influence that their discretion would be sterilized." *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 936 (1993); *see also Revlon, Inc. v. MacAndrews & Forbes Holdings*, Del.Supr., 506 A.2d 173, 176 n. 3 (1986); *Packer v. Yampol*, Del.Ch., C.A. No. 8432, Jacobs, V.C., mem. op. at 35–36, 1986 WL 4748 (1986); *Lewis v. Fuqua*, Del.Ch., 502 A.2d 962, 967 (1985).

---

**13.** There is no evidence of record, nor any suggestion by the plaintiffs, that the Special Committee members were financially interested in the Mirada purchase.

The 1991 Mirada transaction was approved by a five person Special Committee of MAXXAM directors. For the entire fairness burden of proof to be imposed upon the defendants, the NL plaintiffs would have to establish that at least three of the five Committee members lacked independence. The NL Plaintiffs do claim that at least three Committee members lacked independence, because each was in some way "beholden" to Hurwitz, who controlled both Federated and MAXXAM. Specifically, the NL Plaintiffs point out that three Special Committee members were employed as highly paid officers of or consultants to a Hurwitz controlled entity, as follows:

(1) In 1988 a MAXXAM subsidiary retained former Governor John Connally (who had recently emerged from personal bankruptcy and was not financially independent) as a consultant. Under the terms of his consulting contract, Governor Connally was paid $250,000 per year, and the contract was renewed annually until Governor Connally's death in 1993. Thus, in the year the Mirada transaction took place Governor Connally was working for a Hurwitz controlled entity as a paid consultant whose $250,000 contract came up for renewal at the end of that year and subsequent years.

(2) John Seidl had been Chairman and CEO of Kaiser Aluminum, another Hurwitz controlled entity, since 1989. In that capacity, Mr. Seidl received an annual salary of $450,000, and in the year of the Mirada transaction, he received additional compensation of over $4.8 million through a Kaiser incentive plan. Additionally, Mr. Seidl became president of MAXXAM in 1990 under an employment contract running through 1994.

(3) William Leone was President of MAXXAM from 1980 to 1990. In his last year as MAXXAM's President, Leone received over $900,000 in compensation from that company. After the end of his term he entered into a one year $250,000 consulting contract with a MAXXAM subsidiary. That contract was operative at the time of the Mirada transaction.

The question is whether these financial and personal relationships would likely have disabled a majority of the Special Committee from deciding, independent of Hurwitz, whether or not to approve the Mirada transaction. I conclude that that question must be answered in the affirmative.

Mr. Hurwitz's position as MAXXAM's controlling stockholder clearly placed him "in a position to exert considerable influence" over the Special Committee members who were employed or retained as consultants by his companies at high compensation levels. In *Rales v. Blasband, supra,* two directors were employed as highly paid officers of a company controlled by two brothers who had an interest in a challenged transaction. Our Supreme Court held that those directors were "beholden to [the brothers] in light of [their] employment", and, therefore, could not be regarded as independent. *Id.* at 937. That conclusion is equally appropriate here. At the time of the Mirada transaction, a majority of the Special Committee—Messrs Connally, Seidl, and Leone—were receiving significant payments from Hurwitz-controlled entities as compensation for their services to MAXXAM or its subsidiaries.

The NL Plaintiffs have established facts that, at the very least, raise serious questions as to the independence of a majority of the Special Committee. Therefore, the settling parties have not persuaded me that at a trial the defendants would be protected by the business judgment standard of review. In my opinion, it is probable that at a trial, the defendants would be required to establish that the 1991 Mirada transaction was entirely fair to MAXXAM. Whether the defendants would likely be able to carry that burden is the question to which I next turn.

### B. *Fairness of the 1991 Mirada Transaction*

A pivotal issue is the fairness of the $43 million purchase price paid for the Mirada. On that issue the evidence is in conflict. Some of the defendants' valuations locate that price within a reasonable range of values. However, some of MAXXAM's experts valued the Mirada at considerably less, and the $43 million value arrived at by Cushman

& Wakefield was inconsistent with that firm's underlying market analysis. The NL Plaintiffs offer their own expert's valuation of the Mirada at $20 million less than the amount actually paid by MAXXAM. Because the present record raises significant doubts as to whether the $43 million price MAXXAM paid for the Mirada was fair, I cannot conclude that at a trial the defendants would meet their burden of proof on that issue.

But that conclusion does not rest solely on price. The defendants' conduct in connection with the Mirada transaction also raises serious questions as to whether Federated and Hurwitz dealt fairly with MAXXAM. First, the timing and initiation of the transaction is suspect. Federated proposed the sale to MAXXAM after it had already become clear that the progress of the development project was extremely slow, and that there was a high degree of risk that MAXXAM's initial loan "investment" might never be recovered. Second, the decision to buy the Mirada *at that time* for $43 million was, given MAXXAM's other alternatives, of questionable economic rationality. MAXXAM held a deed of trust to the Mirada to secure the loans it had previously made to Federated. Those loans had not been repaid, had little apparent prospect of being repaid, and would fall due in a year. In that event MAXXAM would be entitled to foreclose and "buy in" its security (the Mirada) for the amount of the unpaid loans plus interest—about $34 million. Why, then, would MAXXAM's directors, if they were truly independent and motivated solely to protect the interests of MAXXAM's public shareholders, agree to acquire that property for $43 million? The record leaves that question unanswered. Third, there is no evidence that the Special Committee bargained for a lower price before it agreed to pay $43 million. What the record does show is that MAXXAM informed Federated of Cushman & Wakefield's $43 million appraised value, and thereafter the Special Committee later agreed to pay that amount to Federated with

no effort to bargain the price down. That is difficult to reconcile with the conduct one would expect of independent directors intent on protecting the interests of MAXXAM's public shareholders.

For these reasons, I conclude that the defendants have not shown that at a trial they would likely be able to carry their burden of proving that MAXXAM's acquisition of the Mirada was entirely fair.

## VII. *THE VALUE OF THE CLAIMS COMPARED TO THE SETTLEMENT AMOUNT*

Because the settlement proponents have not established that the claims being settled are more likely than not without merit, the ultimate question becomes: what is the worth of those claims compared to the values being offered in settlement? That comparison is not easily accomplished because the record is incomplete.

In their Third Amended Complaint the shareholder plaintiffs pray for rescission of the 1987 loans and the 1991 Mirada transaction, and for an accounting. Rescission is a permissible equitable remedy in cases where a self-dealing fiduciary breaches its duty of loyalty. Rescission entails avoiding a transaction,[14] is restitutionary in nature, and requires that the parties be restored to the *status quo* before the avoided transaction was consummated. In cases where rescission is found to be impractical, rescissory damages may be an appropriate substitutionary form of equitable relief.[15]

■ Whether or not a rescissory unwinding of the challenged transactions would be feasible cannot presently be determined. But, whether the appropriate remedy were found to be rescission or rescissory damages, to calculate the value of a hypothetical judgment ordering either form of relief requires evidence of the present value of the assets

---

14. In this case, a restoration of the *status quo ante* would require unwinding the 1987 loan and the 1991 Mirada transactions in an exchange of assets that would include cash, the Mirada, and the MCOP preferred stock.

15. Rescissory damages are a "money award designed to be as nearly as possible the financial equivalent of rescission." *Cede & Co. v. Technicolor, Inc.*, Del.Ch., C.A. No. 7129, Allen, C., mem. op., at 17, 1987 WL 4768 (Jan. 13, 1987), *rev'd on other grounds*, Del.Supr., 542 A.2d 1182 (1988).

exchanged in the 1991 Mirada transaction. Rescissory damages are measured by ascertaining the fair value of the assets to be transferred or restored as of the time of judgment. *Lynch v. Vickers Energy Corp.*, Del.Supr., 429 A.2d 497, 503 (1981).

Unfortunately, except for statements that the Southern California real estate market has experienced a general downturn, there is no record evidence indicating the present value of either the Mirada or the other assets exchanged in the 1991 purchase. The record does contain conflicting estimates of the Mirada's value in 1991. For example, the Frauenthal appraisal submitted by NL Plaintiffs places the Mirada's value in 1991 at $23 million—$20 million less than Cushman & Wakefield's valuation. First Boston, a MAXXAM-retained expert, opined that a reasonable value of the Mirada in 1991 could have been as low as $36 million. However, this evidence is insufficient to determine the current value of the Mirada and the other assets acquired in the Mirada purchase. For that reason, the Court cannot begin to estimate the value of a judgment awarding rescission or rescissory damages. Because the record does not permit an informed estimate of the value (or range of values) of the claims being settled, the Court is unable to make the comparison required under the fifth *Polk* factor.

■ As earlier noted, the burden of proving the adequacy of the settlement rests upon the settlement proponents. *Barkan*, 567 A.2d at 1286; *Lewis v. Hirsch, supra*, mem. op. at 7. Those parties have adduced no evidence that persuasively demonstrates that the value of a judgment for the plaintiffs granting rescission or rescissory damages would be so *de minimus* as to render the (undiscounted) $3 million settlement amount fair and reasonable. Absent such evidence, and because the record indicates that the Mirada may have been significantly overvalued at the time it was sold to MAXXAM, I conclude that the settlement proponents have failed to carry their burden of establishing that the settlement merits the approval of this Court.

\*　　\*　　\*

Having balanced the policy favoring the settlement of lawsuits against the policy of ensuring that the interests of stockholders are properly protected, the Court concludes that in this case the latter policy must prevail. Having expounded at length on the legal reasons why that must be so, the Court would be remiss by not commenting on the underlying factual reason why the parties have come to this pass: the flawed manner by which the settlement was achieved.

Settlements are normally achieved with the participation and concurrence of all parties to the litigation. That was not so here. This settlement was negotiated without the participation—and, indeed, was arrived at over the objection—of a 14% stockholder that was vigorously prosecuting its derivative claim against the defendants. The settling parties contend that they proceeded in this fashion because the NL Plaintiffs' counsel had led them to believe that a $3 million settlement would be satisfactory. The NL Plaintiffs assiduously deny that. I find the settling parties' contention difficult to accept. Even if there was an initial misunderstanding between counsel for the NL Plaintiffs and the shareholder plaintiffs, once the former made it clear that a $3 million settlement was unacceptable, if the settling parties had truly desired to obtain NL's concurrence they would have then attempted to renegotiate the settlement.

Instead, this case has the unmistakable footprint of an effort by the defendants to negotiate a settlement with an adversary that they preferred, in order to extinguish claims being pressed by the adversary whom they disfavored, and to relegate that disfavored adversary to the status of an objector to the settlement. This transmutation of the settlement process into an offensive weapon has been criticized by our Supreme Court and has resulted in significant changes in the procedures for approving settlements of class actions. *Prezant v. DeAngelis*, Del.Supr., 636 A.2d 915 (1994). Although the exclusion of a significant party litigant from the settlement negotiations will not, in and of itself, invalidate a proposed settlement, that approach, because of its inherent potential for abuse, will cause the settlement to be careful-

ly scrutinized. *See, e.g., Stepak v. Tracinda Corp.*, Del.Ch., C.A. No. 8547, Allen, C., 1989 WL 100884 (Aug. 15, 1989). This Opinion is the product of such scrutiny.[16]

The motion to approve the proposed settlement is denied. IT IS SO ORDERED.

---

16. But not its outcome. Under any standard of scrutiny, the settlement in this particular case would have been found wanting.