This appeal arises from a preliminary injunction issued in an action alleging usurpation of a corporate opportunity. The appellees, the plaintiffs below, who sought and obtained the injunction in this action, are Quixote Corporation ("Quixote") and Disc Manufacturing, Inc. ("DMI"). Quixote is a Delaware corporation, with headquarters in Chicago, Illinois. It is a holding company for subsidiaries Stenograph Corporation, Energy Absorption Systems, and DMI. DMI, the other plaintiff in this case, was acquired by Quixote on April 30, 1990. From January 1988 to May or June 1990, DMI was known as Disctronics Manufacturing, Inc., and before January 1988, it was known as LaserVideo, Inc.
The appellants, the defendants below, who the plaintiffs say usurped the alleged corporate opportunity and who were enjoined, are (1) Disctronics, Ltd., an Australian holding company; (2) Disctronics Australia, Ltd., an Australian holding company; (3) Disctronics (U.S.), Inc., a Delaware corporation and a wholly owned subsidiary of Disctronics Australia, Ltd.; (4) Disctronics, Inc., a Delaware corporation and a wholly owned subsidiary of Disctronics Australia, Ltd.; (5) Moray Investments, a Cook Island shelf corporation and a wholly owned subsidiary of Disctronics, Ltd.; (6) Memory Tech, Inc. ("MTI"), a Delaware corporation and a wholly owned subsidiary of Moray; (7) Peter Massey, director or chairman of the board and/or chief executive officer of each of the aforementioned corporations; (8) Kevin Donovan, director of several of the aforementioned corporations; and (9) Douglas Adams and David Mackie, each of whom played various roles in the aforementioned corporations. The appellants, except for MTI, will be referred to collectively as the "Disctronics Group" in this opinion. Massey was chief executive officer of DMI from July 1989 until April 30, 1990, when Quixote acquired total ownership; Donovan, Adams, and Mackie all served on DMI's board of directors at various times. From January 1988 to April 1990, the Disctronics Group controlled DMI. The activities alleged to have occurred during this period form the basis of this cause of action.
 I. FACTS
A. The relationship between Quixote, the Disctronics Group, and DMI
Prior to 1987, LaserVideo was a wholly owned subsidiary of Quixote. It had two plants, one in Anaheim, California, which manufactured video discs, and one in Huntsville, Alabama, which manufactured audio discs. During this same period, the Disctronics Group was involved in the production of compact audio discs and had operations in Australia, Asia, and Europe. It was looking to expand into the United States. During 1987, it negotiated with Quixote to buy LaserVideo. The negotiations led to an agreement to sell LaserVideo to LaserVideo Acquisition Corporation ("LVAC"), which had been formed by the Disctronics Group for the express purpose of purchasing LaserVideo. The total purchase price was $55.5 million; $29 million was paid at closing, and $26.5 million was due when called anytime after January 15, 1989. Closing took place on January 15, 1988, and LaserVideo became Disctronics Manufacturing, Inc. The sale agreement named LVAC as the purchaser, and Disctronics, Ltd., and Quatro, Ltd. (the parent corporation of Disctronics, Ltd.), as the acquiring companies.
The Disctronics Group was unable to pay the $26.5 million balance owed on the purchase price when called. On January 17, 1989, Quixote sued LVAC; Disctronics, Ltd.; Quatro, Ltd.; DMI; and Disctronics Australia, Ltd., in the Circuit Court of Cook County, Illinois. On February 3, 1989, all defendants, except DMI, consented to the entry of an agreed order stating that the defendants were to pay Quixote the $26.5 million no later than March 3, 1989; the defendants paid $500,000 for the extension. The balance of $26.5 million was not paid by the March 3 deadline, and a default *Page 451 
judgment was entered against the Disctronics Group on March 7, 1989.
On March 21, 1989, the judgment was vacated by consent of the parties in favor of a comprehensive settlement agreement; the purpose of the settlement agreement was to provide the Disctronics Group additional time to accomplish financial restructuring in order to raise the cash needed to pay Quixote the balance of the purchase price. The terms of the agreement were as follows: (1) on March 24, 1989, the Disctronics Group was to pay Quixote $1.6 million as advance interest on the $26.5 million from March 3 to October 8; (2) on March 31, 1989, the Disctronics Group was to pay Quixote $1.5 million as a partial payment of principal; and (3) on or by October 3, 1989, the Disctronics Group was to pay $25.2 million, the balance of the obligation. Quixote also received a pledge of 100% of the stock in LVAC and DMI. On October 4, the Disctronics Group, unable to pay the balance owed, defaulted.
Following the October 4 default, the Disctronics Group represented that they had no present ability to pay, but that they had engaged First Boston Corporation, a nationally recognized investment brokerage firm, to assist them in refinancing the Disctronics Group's debt structure.
Prior to this time, the Disctronics Group had tried to refinance their entire world debt, which was approximately $150 million, through Australia and New Zealand Banking Group Limited ("ANZ"). In the fall of 1989, the focus had shifted to an attempt to refinance the debt of DMI only, a debt that totalled $54.9 million ($28.3 million under a credit agreement between DMI and ANZ, plus the amount due Quixote).
The Disctronics Group bargained with Quixote in order to maintain the corporate structure of DMI so that DMI could obtain financing from First Boston. These negotiations culminated in what the parties refer to as the "Work-Out Agreement." The "Work-Out Agreement" stated that it had been entered into because the Disctronics Group had requested an extension of time in order to obtain additional financing, the proceeds of which would be used to satisfy the indebtedness due Quixote. The agreement also stated that Quixote had determined it was in "its best interest under the circumstance in order to maximize the potential for payment, to convert its debt position to that of an equity holder." Under the terms of the "Work-Out Agreement," Quixote exchanged the $25.4 million debt of the Disctronics Group for 49% of the common stock in DMI and 12% of the preferred nonvoting stock in DMI and the preferred stock in LVAC. Quixote gave LVAC an option to repurchase the stock just mentioned if a payment schedule set forth in the agreement was complied with.
The initial trigger date was April 30, 1990, at which time Quixote was to be paid at least $3.3 million in order to extend the Disctronics Group's option to June 30, 1990. If full payment or the extension payment was not made by April 30, the "Work-Out Agreement" further provided that Quixote's preferred stock would gain voting rights and the remaining 51% interest in the common stock in DMI would be sold to Quixote for the nominal sum of $1,000, leaving Quixote as the sole owner of DMI. The "Work-Out Agreement" also provided:
 "The parties further agree that neither this Agreement nor any past or subsequent negotiations or course of dealing shall constitute a partnership or joint venture among the parties, nor do they establish any relationship of principal to agent between the parties. Each party agrees that they are not authorized to represent to any third party that any partnership or agency relationship exists between Quixote and Disctronics Group, nor shall Quixote be obligated to any third party in connection with any expense or other obligation relative to the Disctronics Refinancing."
The terms of the agreement also required Donovan to step down as a director of DMI. The trial court found as follows:
 "The design of the 'Work-Out Agreement' created a system that was self-enforcing. Quixote acquired DMI stock, and made provisions for LVAC and *Page 452 
Disctronics Limited to buy it back if they could raise the monies due Quixote. In turn, the Disctronics Group obtained additional time to pursue their debt restructuring efforts, and, effective control of all DMI operations except those 'Outside the Ordinary Course of Business' . . . and certain 'Capital Expenditure Budgets.'"
(Emphasis supplied.)
The Disctronics Group defaulted on April 30, 1990, and Quixote became the sole stockholder of DMI. The corporate name was changed to Disc Manufacturing, Inc.
B. The relationship between the Disctronics Group, Mitsubishi, and MTI
The underlying cause of action in this case concerns the Disctronics Group's acquisition of MTI from Mitsubishi, Inc., while the Disctronics Group held 51% of the stock in DMI and Quixote held the remaining 49%. The trial court's order granting the preliminary injunction found the following facts regarding the contacts between the Disctronics Group and Mitsubishi regarding the acquisition of MTI:
In early February 1986, Donovan and Massey formed Disctronics, Ltd., to manufacture compact audio discs. Construction was started on a plant in Braeside Victoria, to service the Australia and New Zealand market. In mid-1986, Donovan traveled to Japan and negotiated with Mitsubishi for the purpose of purchasing mastering equipment for the Braeside plant. During the visit, Donovan learned that Mitsubishi was in the process of building a plant in Plano, Texas, with its joint venture partner, ElectroSound, to manufacture compact discs for the United States market. The trial court found that, during 1986, the Disctronics Group had begun to plan a "global strategy." The court also found that the four key components of this "global strategy" were:
 "(1) consolidation of the Australian/New Zealand market; (2) expansion into the European and U.S. markets through a network of sales offices and solicitation of a customer base; (3) acquisition of existing manufacturing facilities in Europe and the U.S.; and (4) persuasion of major record companies against 'vertical integration' (i.e., divesting or de-emphasizing manufacturing operation) — all hopefully leading to the establishment of Disctronics Limited as the dominant independent producer in the compact disc industry."
The trial court found that, as part of the Disctronics Group's "global strategy," Donovan had negotiated a "memorandum of understanding" with Mitsubishi in November 1986, which stated, in part, that "Mitsubishi Corporation, Memory Tech Corporation, and Disctronics Limited agree to continue the development of their global relationship for the benefit of all three partners."
In July 1987, representatives of the Disctronics Group met with a representative of Mitsubishi and discussed the proposal that the Disctronics Group acquire the MTI plant in Texas. The trial court found that Donovan's notes from the meeting memorialized two important facts:
 "The first is implicit: Disctronics Limited had broached the idea of buying the MTI facility sometime before that meeting (Donovan testified talks were on-going from March 1987). The second is explicit: Disctronics did not want to acquire Mitsubishi's interest only, but also that of its joint venture partner — '100% of the [MTI] Plant in the U.S.A.' "
The trial court noted that while maintaining momentum in the Mitsubishi negotiations for MTI, Disctronics, Ltd., opened discussions with Quixote about the purchase of its plants in the United States. According to Donovan, those discussions proceeded simultaneously with the Mitsubishi negotiations between July and October 1987 and on parallel tracks. The Mitsubishi negotiations "stalled" in late September, and the Disctronics Group reached an agreement with Quixote to acquire DMI.
Donovan testified that he had maintained continuous contact with Mitsubishi. He stated that he would inquire about MTI and also asked about rumors in the industry that Mitsubishi was having problems with its joint venture partner. In early 1989, *Page 453 
Mitsubishi bought out its joint venture partner ElectroSound. The trial court found that Donovan had what it termed as the "first tug on his bait" during a November 1, 1989, telephone conversation with a representative of Mitsubishi, who, at the time, refused to discuss MTI and said only that he might be in a position to talk later, in December or after the first of the year.
The negotiations with Mitsubishi resumed, and in December, Donovan telefaxed an offer to Mitsubishi. Mitsubishi acknowledged receipt of the offer and expressed an interest in further discussion. A meeting took place in Japan between Donovan, Massey, and a representative of Mitsubishi. At the end of the meeting, Donovan, on behalf of Disctronics, Ltd., executed a "Memorandum of Intent," which contemplated another offer. On January 18, 1990, Donovan submitted another proposal to Mitsubishi, and on January 29, Mitsubishi, by a telephone conversation, accepted the Disctronics Group's offer.
On February 23, 1990, Mitsubishi and Donovan executed an agreement providing for the purchase of all MTI stock by Disctronics, Ltd. The transaction was to close March 2, 1990, and no cash was due at closing. The purchase price, $13 million, was to be paid by two notes: (1) the first note, which was due 90 days after closing, for $6.5 million; and (2) an installment note payable between 1992 and 1995 for the remaining $6.5 million. Both notes were secured by a pledge of MTI's real estate and equipment assets. Upon payment of the first note, Disctronics, Ltd., could substitute its guaranty as security for the long-term note, thereby releasing MTI assets from the pledge. Also, the interest of Disctronics, Ltd., in the Mitsubishi contract was assignable.
On March 1, 1990, Disctronics, Ltd., acquired the offshore Cook Island shelf corporation, Moray Investments, and assigned the contract rights and interests under the MTI purchase agreement to Moray.
 II. THE PROCEEDINGS BELOW
DMI and Quixote filed a complaint against the Disctronics Group in the Circuit Court of Madison County, Alabama, on June 13, 1990, alleging several causes of action. The complaint alleged, among other claims, that the defendants had diverted business and contracts from DMI to MTI in violation of fiduciary duties and that they had engaged in unfair competition in violation of §§ 8-12-1 et seq., Ala. Code 1975. However, the paramount claim, and the one presented by this appeal, alleged a breach of fiduciary duty by certain defendants in failing to present to DMI and Quixote the corporate opportunity represented by the acquisition of MTI.
On June 19, 1990, Quixote and DMI filed a "Motion for Temporary Restraining Order and Preliminary Injunction." After a three-week hearing, beginning July 2, 1990, the Court entered a preliminary injunction on July 31, 1990.
The trial court found that DMI had a protectable interest in MTI, the acquisition of which the judge termed a "ludicrously good deal." The trial court found that, as fiduciaries of DMI and Quixote, the Disctronics Group had been "grievously unfair" to DMI and Quixote and had, therefore, violated their fiduciary duties by taking for themselves a corporate opportunity properly belonging to DMI. In addition, the trial court found that, unless enjoined, the Disctronics Group would cause DMI irreparable harm by taking DMI's major customer to MTI. Finally, the court found that the appropriate remedy for the usurpation of a corporate opportunity would be the imposition of a constructive trust. Considering all of these factors, the trial court concluded that DMI and Quixote had presented a fair question as to the existence of a right to be protected and had established a substantial likelihood of success on the merits.
The Disctronics Group appealed.
 III. STANDARD OF REVIEW
A. Ore tenus proceeding
The trial court based its judgment on the evidence presented to it. A trial court's judgment, when based upon findings *Page 454 
of fact drawn from ore tenus evidence, is presumed correct and should be reversed
 "only if the judgment is found to be plainly and palpably wrong, after a consideration of all of the evidence and after making all inferences that can logically be drawn from the evidence. The trial court's judgment will be affirmed if there is credible evidence to support it."
Martin v. First Federal Savings Loan Ass'n of Andalusia,559 So.2d 1075, 1078 (Ala. 1990). However, there is no presumption where the trial court has misapplied the law to the facts. "[T]here is a presumption in favor of the findings of fact of the trial court where testimony is [presented] ore tenus. However, such a presumption does not exist where the trial court erroneously applies the principles of law involved."Collier v. Brown, 285 Ala. 40, 43, 228 So.2d 800, 802 (1969).
B. Preliminary injunction
When reviewing a preliminary injunction, this Court accords wide discretion to the trial court hearing the motion, and the injunction will not be disturbed on appeal absent an abuse of that discretion. "The trial judge's discretion is a legal or judicial one, subject to review for abuse or improper exercise, as where there has been a violation of some established rule of law or principle of equity, or a clear misapprehension of the controlling law." Martin, 559 So.2d at 1078. In order to show an abuse of discretion, the appellant must show that "the trial judge committed a clear and palpable error which, unless corrected, will constitute manifest injustice." Id.
In Martin, Justice Houston set forth the established tests for the trial court's review of a preliminary injunction:
 "A preliminary injunction will not issue unless without it the plaintiff would suffer immediate and irreparable injury and unless the plaintiff has no adequate remedy at law. The burden is on the complainant to satisfy the trial court that there is at least a reasonable probability of ultimate success on the merits of the case.
"In Howell Pipeline Co. v. Terra Resources, Inc.,454 So.2d 1353, 1356 (Ala. 1984), we noted the development of a three-pronged test by which the trial court can review a motion for a preliminary injunction:
 " '1. ". . . if [the trial judge] finds that the party has presented a fair question as to the existence of the right to be protected, and further finds that temporary interference to preserve the status quo is convenient and expedient, then he may exercise his discretion and grant the injunction."
 " '2. ". . . An injunction should not be granted unless it is necessary to prevent irreparable injury."
 " '3. "Injunctions . . . will not be granted merely to allay apprehension of injury; the injury must be both imminent and irreparable in a court of law." '
 ". . . In applying these standards, the trial court, in its discretion and given the facts and circumstances of each case, may consider and weigh the relative hardships that each party may suffer against the benefits that may flow from the grant of the preliminary injunction."
Id. at 1078-79 (citations omitted).
C. Choice of law
The parties contend that this case is controlled by Delaware law. The established rule of conflicts law is that "the internal corporate relationship is governed by the law of the state of incorporation." See P. John Kozyris, Corporate War andChoice of Law, 1985 Duke L.J. 1, 15. Restatement (Second) ofConflicts of Law § 309 (1971) states the proposition as follows:
 "The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, *Page 455 
in which event the local law of the other state will be applied."
Comment (c) to § 309 states:
 "Issues relating to the liability of the directors and officers for acts [such as seizing a corporate opportunity or causing the making of a contract or the commission of a tort] can practicably be decided differently in different states. It would be practicable, for example, for a director to be held liable for a given act in one state and to be held not liable for an identical act in another state. Nevertheless, in the absence of an applicable local statute, the local law of the state of incorporation has usually been applied to determine the liability of the directors or officers for acts such as these to the corporation, its creditors and shareholders. This law has usually been applied even in a situation where it might be thought that some other state had a greater interest than the state of incorporation in the issue to be determined. The local law rule of a state other than the state of incorporation is most likely to be applied in a situation where this rule embodies an important policy of the other state and where the corporation has little contact with the state of its incorporation."
 IV. LAW OF CORPORATE OPPORTUNITY
The Delaware law regarding corporate opportunity was "settled" by two decisions, Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503 (1939), and Johnston v. Greene, 35 Del. Ch. 479, 121 A.2d 919 (1956). See Equity Corp. v. Milton, 43 Del. Ch. 160, 221 A.2d 494 (1966).
 "The rule of the Guth case is that when there is presented to a corporate officer a business opportunity which the corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's business and is of practical advantage to it, or is an opportunity in which the corporation has an actual or expectant interest, the officer is prohibited from permitting his self-interest to be brought into conflict with the corporation's interest and may not take the opportunity for himself.
 "A corollary of the Guth rule is that when a business opportunity comes to a corporate officer, which, because of the nature of the opportunity, is not one which is essential or desirable for his corporation to embrace, being an opportunity in which it has no actual or expectant interest, the officer is entitled to treat the business opportunity as his own and the corporation has no interest in it, provided the officer has not wrongfully embarked the corporation's resources in order to acquire the business opportunity."
Equity Corp., 43 Del. Ch. at 164, 221 A.2d at 497.
The doctrine of corporate opportunity has been called "a species of the duty of a fiduciary to act with undivided loyalty." Science Accessories Corp. v. Summagraphics Corp.,425 A.2d 957, 963 (Del. 1980). Thus, the relevant inquiry is: "to whom is the fiduciary duty owed and at what time?" AnadarkoPetroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1178
(Del. 1988).
At this time, it may be helpful to discuss the nature of the fiduciary duty owed by directors, such as Donovan, as well as by parent corporations, such as Disctronics, Ltd. This duty was described by the New York Court of Appeals as follows:
 "Because the power to manage the affairs of a corporation is vested in the directors and majority shareholders, they are cast in the fiduciary role of 'guardians of the corporate welfare.' In this position of trust, they have an obligation to all shareholders to adhere to fiduciary standards of conduct and to exercise their responsibilities in good faith when undertaking any corporate action. . . . Actions that may accord with statutory requirements are still subject to the limitation that such conduct may not be for the aggrandizement or undue advantage of the fiduciary to the exclusion or detriment of the stockholders.
 "The fiduciary must treat all shareholders, majority and minority, fairly. *Page 456 
Moreover, all corporate responsibilities must be discharged in good faith and with 'conscientious fairness, morality and honesty in purpose.' Also imposed are the obligations of candor and of good and prudent management of the corporation. When a breach of fiduciary duty occurs, that action will be considered unlawful and the aggrieved shareholder may be entitled to equitable relief."
Alpert v. 28 Williams St. Corp., 68 N.Y.2d 557, 568-69,483 N.Y.S.2d 667, 673-74, 473 N.E.2d 19, 25 (1984).
The corporate fiduciary duty is divided into two parts: (1) a duty of care; and (2) a duty of loyalty. The duty of care has been described as requiring officers and directors to act as "ordinarily prudent and diligent men . . . under similar circumstances." Briggs v. Spaulding, 141 U.S. 132, 152,11 S.Ct. 924, 931, 35 L.Ed. 662 (1891). Delaware law provides that
 "directors of a corporation in managing the corporate affairs are bound to use that amount of care which ordinarily careful and prudent men would use in similar circumstances. Their duties are those of control, and whether or not by neglect they have made themselves liable for failure to exercise proper control depends on the circumstances and facts of the particular case."
Graham v. Allis-Chalmers Manufacturing Co., 41 Del. Ch. 78, 84,188 A.2d 125, 130 (1963). One commentator has stated the duty of care as a "duty of attention." See Bayless Manning, TheBusiness Judgment Rule and the Director's Duty of Attention:Time for Reality, 39 Bus.Law. 1477 (1984).
The duty of loyalty, on the other hand, prohibits faithlessness and self-dealing by corporate directors. The duty of loyalty has been explained as follows:
 " 'By assuming his office, the corporate director commits allegiance to the enterprise and acknowledges that the best interest of the corporation and its shareholders must prevail over any individual interest of his own. The basic principle to be observed is that the director should not use his corporate position to make a personal profit or gain other personal advantage.'
 "The duty of loyalty is thus transgressed when a corporate fiduciary . . . uses his corporate office . . . to promote, advance or effectuate a transaction between the corporation and such person (or an entity in which the fiduciary has a substantial economic interest, directly or indirectly) and that transaction is not substantively fair to the corporation.' "
Dennis J. Block, Nancy E. Barton, and Stephen A. Radin, TheBusiness Judgment Rule: Fiduciary Duties of Corporate Directorsand Officers 71 (2d ed. 1988) (quoting Committee on Corporate Laws, American Bar Association, Corporate Director's Guidebook
(rev. ed. 1978), reprinted in 33 Bus.Law. 1595, 1599 (1978)).
The corporate opportunity doctrine is one aspect of the duty of loyalty. The Delaware courts have stated that the determination of whether the duty of loyalty was breached when the opportunity was taken depends upon "the circumstances existing at the time [the opportunity] presented itself to [the fiduciary] without regard to subsequent events," and those courts have said "that due weight should be given to [the] character of the opportunity which [the offeror] envisioned and brought to [the fiduciary's] door." Guth v. Loft, Inc, 23 Del. Ch. 255,277, 5 A.2d 503, 513 (1939).
 V. THE ACQUISITION OF MTI
A. The trial court's findings
The trial court made the following findings of fact and conclusions of law:
 "The testimony and exhibits admitted into evidence at trial establish that the MTI opportunity was presented to Kevin Donovan in his corporate capacity as a director and employee of Disctronics Limited, and, director of DMI. This conclusion is premised upon the long-standing relationship which existed between Mitsubishi and Donovan in his capacity as a representative for the Disctronics Group, which was exploited during his tenure as a formal and de facto director of DMI. *Page 457 
 "Contrary to plaintiffs' assertion that the first mention of the MTI opportunity came from Cal Roberts, DMI's Executive Vice-President for Sales, in his report of November 18, 1989, the MTI opportunity resulted from Disctronics Limited's first contacts with Mitsubishi in the middle and latter months of 1986. Although this nexus was born of an attempt by Disctronics Limited to purchase mastering equipment for its Braeside plant, the relationship quickly blossomed into much more. By November 1986 Kevin Donovan had nurtured the contacts to the point where Mitsubishi and Disctronics Limited embarked upon a partnership designed to
 " 'develop their global strategy for the benefit of all . . . partners [and to] use their best endeavors to further the extent of their collaboration and mutual support as rapidly as possible.'
 Donovan testified that Disctronics Limited and Mitsubishi had been in continuous contact regarding their partnership as embodied in the Memorandum of Understanding since November of 1986. Disctronics Limited's first contacts with Mitsubishi regarding the possibility of acquiring MTI occurred on July 28, 1987, just shortly after Disctronics Limited opened negotiation with Quixote for the purchase of LaserVideo. Disctronics Limited's negotiations for the purchase of the MTI and LaserVideo facilities paralleled each other until October 1987 when Mitsubishi rejected Disctronics Limited's final purchase offer. An agreement regarding the LaserVideo acquisition was reached on November 22, 1987, and the transaction was closed on January 15, 1988. Although Disctronics Limited had acquired a facility to meet its immediate needs, defendants never completely ceased discussions with Mitsubishi regarding their American operations. Because of Donovan's long-standing relationship with Mitsubishi on behalf of Disctronics Limited, he was in a position to inquire about the status of the MTI plant when rumors regarding problems in Mitsubishi's joint venture with ElectroSound surfaced. Between May and July of 1987, Donovan continuously inquired about Mitsubishi's desire to sell MTI. Donovan's persistence on behalf of Disctronics Limited finally paid off on December 14, 1989, when Mitsubishi entered into discussions with Tom Fry (controller for Disctronics Limited and DMI) and Doug Adams (Donovan's stand-in on the DMI board) regarding the sale of MTI.
 "From this course of events, it is clear that Kevin Donovan, on behalf of Disctronics Limited, initiated and nurtured an on-going relationship with Mitsubishi, which existed at least seven months before Quixote and DMI came upon the scene. Throughout this relationship, Donovan was either actively negotiating for the purchase of MTI, seeking negotiations for the purchase of MTI, or making general inquiries into the status of Mitsubishi's worldwide and American operations. Donovan's persistent concern about the Mitsubishi operation, particularly MTI, opened the door to the presentation of the MTI acquisition opportunity."
(Emphasis supplied).
As stated before, Guth, the seminal case regarding corporate opportunity, held that in determining whether the duty of loyalty has been breached, it is important to determine (1) the circumstances at the time of the offer and (2) the offeror's expectations. See Guth, 23 Del. Ch. at 278, 5 A.2d at 513. Under the facts recited above, it is clear that the trial court found that the opportunity grew from the relationship established by Donovan for the benefit of the Disctronics Group and that Mitsubishi preferred to do business with the Disctronics Group. The issue on appeal, therefore, comes down to whether, given those circumstances, a fiduciary duty of loyalty was owed to DMI and/or Quixote. We hold that it was not.
B. Fiduciary duty to DMI
The opportunity presented by MTI was created by the Disctronics Group's relationship with Mitsubishi that had been established long before the Disctronics Group even began negotiations to buy *Page 458 
DMI. Also, with the exception of the period governed by the "Work-Out Agreement," DMI was a wholly owned subsidiary of the Disctronics Group, and no fiduciary duty of loyalty in the context of corporate opportunity is owed by a parent to a wholly owned subsidiary. See Anadarko Petroleum Corp.,545 A.2d at 1174. Also, under the terms of the "Work-Out Agreement," at the end of the option period either the Disctronics Group would control DMI as a wholly owned subsidiary or they would have no interest in the company. Under either scenario, no fiduciary duty of loyalty was owed.
C. Fiduciary duty to Quixote
Quixote claims the Disctronics Group owed it a fiduciary duty, but the Disctronics Group never owed Quixote, a competitor, a fiduciary duty of loyalty. Quixote cites several cases for the proposition that stock pledgees are owed fiduciary duties. See In re Pittsburgh L.E.R.R.,543 F.2d 1058, 1067 (3d Cir. 1976); FDIC v. Kerr, 637 F. Supp. 828,840-41 (W.D.N.C. 1986); Weingard v. Atlantic Savings LoanAss'n, 1 Cal.3d 806, 83 Cal.Rptr. 650, 464 P.2d 106, 112
(1970); Gibson v. Manuel, 534 So.2d 199, 201-02 (Miss. 1988);Gustafson v. Gustafson, 47 Wn. App. 272, 734 P.2d 949, 953-54
(1987), review denied, 109 Wn.2d 1024 (1988). After examining those cases, we find that they concerned alleged breaches of the duty of care owed by the corporation, as well as causes of actions based upon the stock pledge agreement. In re Pittsburgh L.E.R.R., 543 F.2d at 1067 (action brought to challenge settlement agreements in other shareholder derivative suits that dissipated assets of corporation); Kerr,637 F. Supp. at 838 (pledgee could maintain action involving claims under RICO and claims of corporate waste and fraudulent liquidation when the defendant was alleged to have breached "his duty to refrain from doing anything which might injure the value of FDIC's collateral"); Weingard, 1 Cal.3d at 818,83 Cal.Rptr. at 656, 464 P.2d at 112 (pledgee of stock has an interest in the stock sufficient to entitle him to bring an action alleging fraudulent conveyance that affects the preservation and protection of the assets and property of the corporation);Gibson, 534 So.2d at 202, 203 (a pledgor of corporate stock when in control of the corporation has the affirmative duty to preserve the corporate assets for the benefit of the pledgee; duty of the pledgor was "to conduct his office with ordinary prudence and with all good fidelity to the end that the value of its shares be maintained"); Gustafson,47 Wn. App. at 276-78, 734 P.2d at 952-54 (in an action regarding wrongful disposition of corporate property, a stock pledgee has standing to maintain a derivative action in order to protect her security interest); see also Giblin v. Murphy, 97 A.D.2d 668,469 N.Y.S.2d 211, 215 (1983) (directors owe a duty of care to protect the stock interest of pledgees, and that duty is breached by "willful, wanton negligence with respect to its assets"); Ashburn v. Wicker, 95 N.C. App. 162, 165,381 S.E.2d 876, 878 (1989) ("a pledgee of corporate stock has a sufficient beneficial interest to have standing to sue the corporation derivatively for mismanagement"), overruled on other grounds byAlford v. Shaw, 327 N.C. 526, 398 S.E.2d 445 (1990). We find these aforementioned cases, cited by Quixote, unpersuasive.
Quixote also argues that, because it owned 49% of the stock in DMI at the time the Disctronics Group executed the purchase agreement, it can claim that the opportunity presented by MTI belonged to DMI, and therefore, to it as a stockholder. This argument, while facially appealing, fails to examine the realities of the situation. Quixote, in the "Work-Out Agreement," stated that the purpose of the agreement was to secure the assets and to prevent bankruptcy by DMI in order to ensure payment of DMI's indebtedness to Quixote. The agreement provided that at the end of the option period, barring extensions, either Quixote or the Disctronics Group would ownall of DMI. Also, and we think this important, the agreement stated that the agreement created no relationship such as partnership or joint venture between the Disctronics Group and Quixote.
Under the facts as found by the trial court, Quixote never became a party to be *Page 459 
protected from the excesses of the majority shareholder, the Disctronics Group. The opportunity allegedly usurped from DMI was never DMI's opportunity and could not logically be so characterized, given the facts of the creation of the opportunity and the relationship of the concerned parties.
Thus, we hold that Quixote and DMI cannot, as a matter of law, maintain an action for usurpation of the corporate opportunity represented by the Disctronics Group's acquisition of MTI. We hold that the trial court erred in granting Quixote and DMI a preliminary injunction. Therefore, we reverse the order of the trial court and remand this action for further proceedings in accordance with this opinion.
REVERSED AND REMANDED.
ADAMS, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
MADDOX, J., dissents.