[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1156 
This is the second time this controversy has come before this Court. The parties have not changed since the resolution of the first appeal. The appellants and cross-appellees are the defendants in the underlying action:
 "(1) Disctronics, Ltd., an Australian holding company; (2) Disctronics Australia, Ltd., an Australian holding company; (3) Disctronics (U.S.), Inc., a Delaware corporation and a wholly owned subsidiary of Disctronics Australia, Ltd.; (4) Disctronics, Inc., a Delaware corporation and a wholly owned subsidiary of Disctronics Australia, Ltd.; (5) Moray Investments, a Cook Island . . . corporation and a wholly owned subsidiary of Disctronics, Ltd.; (6) Memory Tech, Inc. ('MTI'), a Delaware corporation and a wholly owned subsidiary of Moray; (7) Peter Massey, director or chairman of the board and/or chief executive officer of each of the aforementioned corporations; (8) Kevin Donovan, director of several of the aforementioned corporations; and (9) Douglas Adams and David Mackie, each of whom played various roles in the aforementioned corporations."
Massey v. Disc Mfg., Inc., 601 So.2d 449, 450 (Ala. 1992). The appellants, except for MTI, will be referred to collectively as the "Disctronics Group" in this opinion, just as they were in our first opinion. The appellees/cross-appellants, the plaintiffs below, are Quixote Corporation and Disc Manufacturing, Inc. (a wholly owned subsidiary of Quixote Corporation). The appellees will be hereinafter referred to collectively as "the plaintiffs." *Page 1157 
The first appeal in this matter, Massey, 601 So.2d 449, concerned a single issue, whether the trial court had erred in entering a preliminary injunction against the Disctronics Group based upon a theory of usurpation of corporate opportunity. In that opinion, this Court set out the facts underlying the present dispute:
 "Prior to 1987, LaserVideo was a wholly owned subsidiary of Quixote. It had two plants, one in Anaheim, California, . . . and one in Huntsville, Alabama. . . . During this same period, the Disctronics Group was involved in the production of compact audio discs and had operations in Australia, Asia, and Europe. It was looking to expand into the United States. During 1987, it negotiated with Quixote to buy LaserVideo. The negotiations led to an agreement to sell LaserVideo to LaserVideo Acquisition Corporation ('LVAC'), which had been formed . . . for the express purpose of purchasing LaserVideo. The total purchase price was $55.5 million; $29 million was paid at closing, and $26.5 million was due when called anytime after January 15, 1989. . . . LaserVideo became Disctronics Manufacturing, Inc. ['DMI'] . . .
 "The Disctronics Group was unable to pay the $26.5 million balance owed on the purchase price when called. On January 17, 1989, Quixote sued LVAC; Disctronics, Ltd.; Quatro, Ltd.; DMI; and Disctronics Australia, Ltd., in the Circuit Court of Cook County, Illinois. On February 3, 1989, all defendants, except DMI, consented to the entry of an agreed order stating that the defendants were to pay Quixote the $26.5 million no later than March 3, 1989; the defendants paid $500,000 for the extension. The balance . . . was not paid by the March 3 deadline, and a default judgment was entered against the Disctronics Group on March 7, 1989.
 "On March 21, 1989, the judgment was vacated by consent of the parties in favor of a comprehensive settlement agreement; the purpose of the settlement agreement was to provide the Disctronics Group additional time to accomplish financial restructuring in order to raise the cash needed to pay Quixote the balance of the purchase price. . . . On October 4, the Disctronics Group, unable to pay the balance owed, [again] defaulted.
 "Following the October 4 default, the Disctronics Group represented that they had no present ability to pay, but that they had engaged First Boston Corporation . . . to assist them in refinancing the Disctronics Group's debt structure.
". . . .
 "The Disctronics Group bargained with Quixote in order to maintain the corporate structure of DMI so that DMI could obtain financing from First Boston. These negotiations culminated in what the parties refer to as the 'Work-Out Agreement.'. . . Under the terms of the 'Work-Out Agreement,' Quixote exchanged the . . . debt of the Disctronics Group for 49% of the common stock in DMI and 12% of the preferred nonvoting stock in DMI and the preferred stock in LVAC. Quixote gave LVAC an option to repurchase the stock. . . .
 "The initial trigger date was April 30, 1990, at which time Quixote was to be paid at least $3.3 million in order to extend the Disctronics Group's option to June 30, 1990. If full payment or the extension payment was not made by April 30, the 'Work-Out Agreement' further provided that Quixote's preferred stock would gain voting rights and the remaining 51% interest in the common stock in DMI would be sold to Quixote for the nominal sum of $1,000, leaving Quixote as the sole owner of DMI. . . . The trial court found as follows:
 " 'The design of the "Work-Out Agreement" created a system that was self-enforcing. Quixote acquired DMI stock, and made provisions for LVAC and Disctronics Limited to buy it back if they could raise the monies due Quixote. In turn, the Disctronics Group obtained additional time to pursue their debt restructuring efforts, and, effective control of all DMI operations except those "Outside the Ordinary Course of Business". . . and certain "Capital Expenditure Budgets." ' *Page 1158 
"(Emphasis supplied.)
 "The Disctronics Group defaulted on April 30, 1990, and Quixote became the sole stockholder of DMI. The corporate name was changed to Disc Manufacturing, Inc.
". . . .
 "The underlying cause[s] of action in this case [are related to] . . . the Disctronics Group's acquisition of MTI from Mitsubishi, Inc., while the Disctronics Group held 51% of the stock in DMI and Quixote held the remaining 49%. . . . [During this time, defendant Massey was chief executive officer of DMI, as well as a member of DMI's board of directors, and defendants Adams and Mackie also served on the DMI board of directors.]
 "In early February 1986, [defendants] Donovan and Massey formed Disctronics, Ltd., to manufacture compact audio discs. . . . In mid-1986, . . . Donovan learned that Mitsubishi was in the process of building a plant in Plano, Texas, with its joint venture partner, ElectroSound, to manufacture compact discs for the United States market. . . . [D]uring 1986, the Disctronics Group had begun to plan a 'global strategy.'. . .
". . . .
 "In July 1987, representatives of the Disctronics Group met with a representative of Mitsubishi and discussed the proposal that the Disctronics Group acquire the MTI plant in Texas. . . .
 ". . . [W]hile maintaining momentum in the Mitsubishi negotiations for MTI, Disctronics, Ltd., opened discussions with Quixote about the purchase of its plants in the United States. . . . [T]hose discussions proceeded simultaneously with the Mitsubishi negotiations between July and October 1987 and on parallel tracks. The Mitsubishi negotiations 'stalled' . . . and the Disctronics Group reached an agreement with Quixote to acquire [LaserVideo, which became] DMI.
 "Donovan testified that he had maintained continuous contact with Mitsubishi. . . .
 "The negotiations with Mitsubishi resumed, and in December [of 1989], Donovan telefaxed an offer to Mitsubishi. . . . A meeting took place in Japan between Donovan, Massey, and a representative of Mitsubishi. . . . On January 18, 1990, Donovan submitted another proposal to Mitsubishi, and on January 29, Mitsubishi, by a telephone conversation, accepted the Disctronics Group's offer.
 "On February 23, 1990, Mitsubishi and Donovan executed an agreement providing for the purchase of all MTI stock by Disctronics, Ltd. The transaction was to close March 2, 1990. . . . The purchase price, $ 13 million, was to be paid by two notes[.] . . .
 "On March 1, 1990, Disctronics, Ltd., acquired the offshore Cook Island . . . corporation, Moray Investments, and assigned the contract rights and interests under the MTI purchase agreement to Moray.
". . . .
 "[Disc Manufacturing, Inc.,] and Quixote filed a complaint against the Disctronics Group in the Circuit Court of Madison County, Alabama, on June 13, 1990. . . . The complaint alleged, among other claims, that the defendants had diverted business and contracts from DMI to MTI in violation of fiduciary duties and that they had engaged in unfair competition in violation of § 8-12-1 et seq., Ala. Code 1975. [The first appeal, though, concerned only the plaintiffs' claims] . . . alleg[ing] a breach of fiduciary duty by certain defendants in failing to present to [Disc Manufacturing, Inc.,] and Quixote the corporate opportunity represented by the acquisition of MTI.
 "On June 19, 1990, Quixote and DMI filed a 'Motion for Temporary Restraining Order and Preliminary Injunction.' After a three-week hearing, . . . the Court entered a preliminary injunction on July 31, 1990.
". . . .
 "The Disctronics Group appealed [from the preliminary injunction]."
Massey, 601 So.2d at 450-53.
This Court set aside the preliminary injunction, holding it improper because: *Page 1159 
 "Quixote and [Disc Manufacturing, Inc., could not], as a matter of law, maintain an action for usurpation of the corporate opportunity represented by the Disctronics Group's acquisition of MTI."
Massey, 601 So.2d at 459. The reason this Court held that a cause of action for usurpation of a corporate opportunity could not be maintained in this case, as a matter of law, was that the undisputed facts showed that the opportunity to purchase MTI was not a corporate opportunity of DMI. "The opportunity presented by MTI was created by the Disctronics Group's relationship with Mitsubishi that had been established long before the Disctronics Group even began negotiations to buy [LaserVideo]." Id. at 457-58. Therefore, this Court found that "[t]he opportunity allegedly usurped from DMI was never DMI's opportunity and could not be so characterized." Id. at 459.
After the case was remanded, the trial judge eventually entered a summary judgment for the Disctronics Group as to a number, but not all, of the plaintiffs' claims. The trial judge, also, dismissed 7 of the Disctronics Group's 12 counts stated in the counterclaim, without specifying the grounds for the dismissal. The summary judgment was made final pursuant to Rule 54(b), Ala. R. Civ. P. Later, the Disctronics Group moved, pursuant to Rule 5, Ala. R. App. P., to allow an immediate appeal of any interlocutory portions of the trial judge's dismissal order. The trial judge granted the Rule 5 motion, and this Court agreed to hear the interlocutory-appeal portions of the Disctronics Group's appeal.
 I.
The plaintiffs, Quixote Corporation and Disc Manufacturing, Inc., now appeal from the trial judge's order dismissing Counts I, II, and IV of their first amended complaint. Count I alleged that defendants "Disctronics Limited, Disctronics Australia Limited, Donovan, Massey, Mackie and Adams breached their fiduciary duties to [Disctronics Manufacturing, Inc.], committed corporate waste, and misappropriated [Disc Manufacturing, Inc.'s] corporate opportunities." In Count II, the plaintiffs alleged that defendants "Disctronics Limited, Disctronics Australia Limited, Massey, Mackie, Donovan and Adams breached their fiduciary duties to Quixote[, a minority shareholder in DMI], committed corporate waste, and misappropriated DMI's corporate opportunities." Count IV alleged that the various defendants conspired to tortiously interfere with DMI's contractual and business relations and also conspired "to cause and aid [Disctronics Limited, Disctronics Australia Limited, Massey, Mackie, Donovan, and Adams] in the breach of their fiduciary duties to DMI."
The trial judge did not state his reasoning in the original order dismissing Counts I, II, and IV of the plaintiffs' first amended complaint, but in a later order denying the plaintiffs' "motion for reconsideration" the trial judge stated the basis for the summary judgment:
 "[The plaintiffs' motion for reconsideration] is overruled and denied on the basis of Massey v. Disc Manufacturing, Inc., 601 So.2d 449 (Ala. 1992), which [the trial court] interprets as meaning that:
 "plaintiffs and defendants were 'competitor[s]' (id., 601 So.2d at 458);
 "no fiduciary duties of loyalty, good faith, fair dealing, or honesty were consequently owed either by the majority shareholders to the minority shareholders, or vice-versa, under 'the realities of the situation' created by the parties' 'Work-Out Agreement'; and,
 "therefore, such claims as plaintiffs seek to have reinstated are barred 'as a matter of law' (id., at 459). . . ."
If the plaintiffs' claims contained in Counts I, II, and IV of the first amended complaint were based solely upon allegations of usurpation of corporate opportunity as regards the opportunity presented by MTI, the trial judge's reasoning would be totally correct. Our decision in the first appeal clearly disposed of any and all of the plaintiffs' claims that are premised upon the theory that the defendants are liable for usurpation of corporate opportunity regarding the Disctronics Group's purchase of MTI. However, Counts I, II, and IV also seek relief based upon alleged wrongful conduct said to have occurred after the Disctronics Group purchased *Page 1160 
MTI. The issue whether the post-MTI-purchase conduct of the Disctronics Group defendants breached any fiduciary duty legitimately owed to the plaintiffs' corporations was not before this Court on the first appeal, and, therefore, was not decided. See Cooper v. Bailey, 288 Ala. 84, 86, 257 So.2d 332,333 (1972) ("This court does not decide questions which are unnecessary to the disposition of a case on appeal.").
If our first opinion is not read in the context of the single issue presented to this Court in the first appeal, then the language in it would seem to be very broad. However, because the undisputed facts showed that the MTI opportunity clearly arose before the time of the 1989 Work-Out Agreement, it was not necessary for this Court to fully consider the nature of the post-Work-Out Agreement relationship of the parties to this action.[1] Our opinion did not hold that dominant majority shareholders, who are not sole shareholders, do not, under Delaware law, the law applicable to the plaintiffs' breach of fiduciary duty claims, owe fiduciary duties to the corporations that they control.[2] Delaware law clearly establishes that such shareholders do owe certain fiduciary duties by virtue of their status as dominant shareholders and the consequent potential for abuse. See, e.g., Sinclair Oil Corp. v. Levien,280 A.2d 717 (Del. 1971). Not only is it clearly established under Delaware law that "[a] shareholder that owns a majority interest in a corporation, or exercises actual control over its business affairs, occupies the status of a fiduciary to the corporation," but it is also clearly established that such a shareholder also "occupies the status of a fiduciary to . . . [the corporation's] minority shareholders." In re MAXXAM, Inc.,659 A.2d 760, 771 (Del.Ch. 1995) (citing Kahn v. LynchCommunication Systems, Inc., 638 A.2d 1110, 1113 (Del. 1994)). Furthermore, no citation to authority is even necessary to support the proposition that a corporation's officers and board of directors owe certain fiduciary duties to the corporation, under any state's corporation law.
The claims contained in Counts I, II, and IV of the plaintiffs' complaint were not preempted by this Court's decision in Massey v. Disc Mfg., Inc., 601 So.2d 449 (Ala. 1992), to the extent that those claims seek redress for alleged post-MTI-purchase breaches of fiduciary duty by DMI directors and corporate officers and to the extent that those claims seek redress on behalf of DMI and Quixote for alleged post-MTI-purchase breaches of fiduciary duty by DMI's majority shareholder. Therefore, the summary judgment is reversed as to the claims contained in Counts I, II, and IV.
 II.
The Disctronics Group appeals from the dismissal of 7 of their 12 counterclaim counts. The counts dismissed were: (1) Count I, which sought relief based upon a breach of an implied covenant of good faith and fair dealing; (2) Count II, which sought relief based upon an economic duress theory; (3) Count IV, which sought relief based upon a theory of unjust enrichment; (4) Count VII, which sought relief based upon an account and account stated theory; (5) Count VIII, which sought relief based upon a theory of money had and received; (6) Count IX, which sought relief under an unfair competition theory; and (7) Count XI, which sought relief for an alleged breach of fiduciary duty by a director of DMI who was associated with Quixote and an alleged seizure of corporate opportunity by Quixote. *Page 1161 
The trial court failed to state the reasoning supporting, or even the grounds for, its dismissal of these counterclaim counts. After the Disctronics Group filed its counterclaim, the plaintiffs initially argued that the defendants had failed to state a valid claim as to any of the claims dismissed, relying on Rule 12(b)(6), Ala. R. Civ. P. Subsequently, the plaintiffs filed a summary judgment motion, arguing, first, that Alabama courts lack the subject matter jurisdiction to decide Counts I, II, IV, and VIII of the counterclaim, and, second, that the claims contained in Counts I, II, IV, and XI had been released. Therefore, the question before this Court is whether the trial court's dismissal of each counterclaim count was proper, based on any of the dismissal arguments that the plaintiffs made as to that count.
We will address the plaintiffs' jurisdictional argument first. The plaintiffs argue that exclusive subject matter jurisdiction over disputes arising out of or related to the Work-Out Agreement was vested in Illinois state courts by the Work-Out Agreement itself, or, in the alternative, by the "Agreed Final Order" issued by the Circuit Court of Cook County, Illinois, which set aside the March 21, 1989, settlement agreement and, pursuant to the Work-Out Agreement, dismissed Quixote Corporation's original claims.
We need not determine whether the Work-Out Agreement language the plaintiffs cite can be read to vest in Illinois state courts exclusive jurisdiction to deal with disputes arising under the Work-Out Agreement, because contractual forum selection clauses are not enforceable in Alabama's courts. InRedwing Carriers, Inc. v. Foster, 382 So.2d 554, 556 (Ala. 1980), this Court held:
 "We consider contract provisions which attempt to limit the jurisdiction of the courts of this state to be invalid and unenforceable as being contrary to public policy. Parties may not confer jurisdiction by consent, nor may they limit the jurisdiction of a court by consent."
The question whether the Agreed Final Order of the Cook County Circuit Court prevented the trial court from validly taking jurisdiction and deciding the defendants' counterclaims raises a much more difficult question, though, because of the interplay of the Full Faith and Credit Clause of the United States Constitution, Article IV, § 1.
The Full Faith and Credit Clause is basically a constitutional rule of res judicata. It requires that a state court respect the final judgments issued by the courts of other states. In other words, "[t]he general rule is that this command requires the judgment of a sister State to be given full, not partial, credit in the State of the forum." New Yorkv. Halvey, 330 U.S. 610, 614, 67 S.Ct. 903, 906, 91 L.Ed. 1133
(1947). But "[f]or a judgment to be absolutely entitled to extrastate recognition under the full faith and credit clause, it must be final, in the sense that it is not subject to being reopened and modified." Robert A. Leflar et al., AmericanConflicts Law, § 83, p. 247 (4th ed. 1986). Whether a judgment is final and therefore entitled to res judicata treatment under the Full Faith and Credit Clause is determined according to "the local law of the state of rendition." Restatement (Second)of Conflict of Laws, § 107 (1971).
The Agreed Final Order entered by the Cook County, Illinois, Circuit Court states:
 "The Work-Out Agreement shall be specifically enforceable upon any motion of any party and this Court shall have exclusive jurisdiction over all controversies with respect to same."
Because the Agreed Final Order was entered by an Illinois court, we must look to Illinois law to determine if it is final for purposes of the Full Faith and Credit Clause. The Illinois Appellate Court stated in Kandalepas v. Economou, 269 Ill. App.3d 245,252, 206 Ill.Dec. 538, 543, 645 N.E.2d 543, 548
(1994):
 "In Illinois, an agreed order is not a judicial determination of the parties' rights, but rather is a recordation of the agreement between the parties. . . . It is merely a recitation of the settlement agreement between the parties and, like any other agreement, its interpretation is governed by the law of contracts. . . . As such, it may be canceled, rescinded, or modified by operation of law or by the *Page 1162 
explicit or implicit agreement of the parties."
(Citations omitted.) See also People v. Joliet Trust SavingsBank, 315 Ill. App. 11, 42 N.E.2d 90 (1942). Therefore, according to Illinois law, the Agreed Final Order is not a final judgment entitled to res judicata effect, but is, instead, a contract between the settling litigants; therefore, the Full Faith and Credit clause does not require that the Agreed Final Order be enforced to any greater extent than it would be if it were simply a contract.[3] As already stated, Alabama courts do not enforce contractual forum selection clauses. See, e.g., Redwing Carriers, Inc. v. Foster, supra.
Before considering whether any of the Disctronics Group's counterclaims were released, we consider whether those claims were due to be dismissed under Rule 12(b)(6), Ala. R. Civ. P., for failure to state a claim. In Rice v. United Ins. Co. ofAmerica, 465 So.2d 1100 (Ala. 1984), this Court held:
 "[W]e follow . . . the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond reasonable doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief under some cognizable theory of law. In reviewing that issue, this court does not contemplate the likelihood of the plaintiff's prevailing on the facts; rather, all allegations are construed in the light most favorable to [the plaintiff], and all doubts are resolved in her favor."
465 So.2d at 1101.
All parties agree that under Alabama's choice of law rules Illinois law is the correct law to be applied to Counts I, II, IV, VII, and VIII of the defendants' counterclaim. Our question then becomes whether any of those counterclaims "sufficiently pleaded facts that if proven would entitle [the defendants] to recover" under a judicially recognized theory of recovery under Illinois law. Anonymous v. Anonymous, 672 So.2d 787, 790 (Ala. 1995).
The Disctronics Group, as counterclaim plaintiff, cited no Illinois authority, outside of the insurance context, demonstrating, under Illinois law, the legitimacy of their claim alleging breach of the covenant of good faith and fair dealing, contained in Count I of their counterclaim. The Disctronics Group argues that this Court should take it upon itself to expand Illinois's tort of bad faith beyond the insurance context into the field of commercial contracts. InMartin v. Federal Life Ins. Co., 109 Ill. App.3d 596, 65 Ill.Dec. 143, 440 N.E.2d 998 (1982), the Illinois Appellate Court rejected a similar argument for the extension of the tort of bad faith into the employment-contract context, holding:
 "Various authorities have discussed the general principle that contracting parties have a good faith and fair dealing covenant implicit in their agreements; however, according to our understanding of the principle, *Page 1163 
it is essentially used as a construction aid in determining the parties' intent. Hence, in Martindell v. Lake Shore National Bank (1958), 15 Ill.2d 272, 286, 154 N.E.2d 683, the supreme court stated, 'Every contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted. (12 I.L.P., Contracts, sec. 217.)' . . .
 "While we agree that the same conduct may give rise to both tort and contract theories of recovery in some cases, we do not believe that Illinois law recognizes a tort remedy based on an employer's 'bad faith' breach of an implied contract covenant of fair dealing. . . .
 "Care must be taken to prevent the transmutation of every breach of contract into an independent tort action through the bootstrapping of the general contract principle of good faith and fair dealing. We conclude that existing principles of tort law are adequate without our creating a new action based on a vague notion of fair dealing. A general 'bad faith' tort based on breach of contract would undoubtedly be difficult to apply in most cases and superfluous in cases such as the present one, which primarily sounds in contract. . . ."
109 Ill. App. 3d at 605-07, 65 Ill.Dec. at 150, 440 N.E.2d at 1005-06. It seems clear that if Illinois courts will not expand the tort of bad faith beyond the insurance context and into the employment contract context then those courts surely would not expand the tort of bad faith into the commercial contract context; therefore, the dismissal of Count I is due to be affirmed.
In Count II, the Disctronics Group sought relief based upon an allegation of economic duress. Because economic duress is an affirmative defense to a breach of contract action, we can only construe this count as seeking rescission of the Work-Out Agreement. In order for a party to obtain relief under Illinois law based upon a theory of economic duress, the party seeking relief must allege, on the part of the other party to the contract in question, a wrongful act that caused the complaining party to enter into an agreement that he would not have assented to otherwise. See Alexander v. Standard Oil Co.,97 Ill. App.3d 809, 53 Ill.Dec. 194, 423 N.E.2d 578 (1981); see also Carlile v. Snap-On Tools, 271 Ill. App.3d 833, 840, 207 Ill.Dec. 861, 866, 648 N.E.2d 317, 322, app. denied, 163 Ill.2d 550, 212 Ill.Dec. 416, 657 N.E.2d 617 (1995) ("Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances depriving him of the exercise of free will."). Count II reads as follows:
 "Due to Quixote's bad faith negotiations and superior economic position, it was able to coerce the Disctronics Group into executing the Work-Out Agreement.
 "Counter-plaintiffs were thereby forced to surrender their rights as debtors under applicable state law and under the United States Bankruptcy Code, and further forced into granting Quixote valuable concessions before and after April 30, 1990. In addition the counter-plaintiffs have suffered substantial damages from such economic duress. The Work-Out Agreement purported to eliminate any equity rights of counter-plaintiffs in DMI and amounted to a forfeiture. Consequently, the Work-Out Agreement is due to be avoided."
The Disctronics Group alleged no wrongful act on the part of Quixote to support a finding of economic duress. The fact that Quixote threatened to force LVAC, a defaulting debtor corporation, into bankruptcy does not constitute a wrongful act, because "threatening to do that which one has a legal right to do" is not wrongful under Illinois law.Carlile, 271 Ill. App. 3d at 840, 207 Ill.Dec. at 866, 648 N.E.2d at 322. "Nor does the defense of duress exist where consent to an agreement is secured because of mere hard bargaining or the pressure of financial circumstances." Id. The dismissal of Count II of the counterclaim is, therefore, due to be affirmed.
In Counts IV (unjust enrichment) and VIII (money had and received), the Disctronics Group attempts to obtain equitable relief based upon the Disctronics Group's loss of *Page 1164 
ownership of DMI under the terms of the Work-Out Agreement. The case of Barry Mogul and Assocs., Inc. v. Terrestris Dev. Co.,267 Ill. App.3d 742, 750-51, 205 Ill.Dec. 294, 643 N.E.2d 245,251-52 (1994), app. denied, 159 Ill.2d 563, 207 Ill.Dec. 513, 647 N.E.2d 1006 (1995), states:
 "It is well established, as a general rule, that a plaintiff cannot pursue a quasi-contractual claim where there is an enforceable express contract between the parties. [Citations.] In Industrial Lift Truck Service Corp. v. Mitsubishi International Corp. (1982), 104 Ill. App.3d 357, 60 Ill.Dec. 100, 432 N.E.2d 999, the court explained the basis for this general rule:
 " 'Difficulties arise with quasi-contractual claims when there is an express contract between the parties. The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. [Citations.] The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow. Quasi-contract is not a means for shifting a risk one has assumed under contract.' Industrial Lift, 104 Ill. App. 3d at 360-61, 60 Ill.Dec. 100, 432 N.E.2d 999."
(Emphasis added.) The defendants' equitable counterclaims likewise impermissibly seek to use equitable theories to shift the risk imposed upon them by an express contract (the Work-Out Agreement). The dismissal of Counts IV and VIII of the defendants' counterclaim is, therefore, affirmed, because those counts fail to state a legally cognizable claim under Illinois law.
In Count VII of the counterclaim, the Disctronics Group sought relief based upon an account stated theory. The factual basis of this claim is contained in Count VI ("Breach of Contract for $300,000 Escrow"), which was not dismissed. In Count VI, the defendants alleged:
 "[T]he Disctronics Group sought to obtain an 'option' to re-acquire the shares of DMI after April 30, 1990. Quixote required the Disctronics Group to pay Quixote $300,000 as a deposit on the proposed Option Agreement. . . .
 "It was understood and agreed between the parties that Quixote would refund to the Disctronics Group the $300,000, less Quixote's legal fees related to the Option Agreement, if the parties did not execute an Option Agreement.
 "The parties did not execute the Option Agreement.
 "Thereafter, the Disctronics Group demanded the return of the $300,000, minus the appropriate legal fees.
 "Quixote has wrongfully [with]held the $300,000 [from] the Disctronics Group in violation of the agreement between the parties. . . ."
Under Illinois law, "[a]n account stated [is] defined as an agreement between parties who have had previous transactions that the account representing those transactions is true and that the balance stated is correct, together with a promise, express or implied, for the payment of such balance." W.E.Erickson Constr., Inc. v. Congress-Kenilworth Corp., 132 Ill. App.3d 260,267, 87 Ill.Dec. 536, 542, 477 N.E.2d 513, 519
(1985), judgment aff'd. and remanded, 115 Ill.2d 119, 104 Ill.Dec. 676, 503 N.E.2d 233 (1986). Count VII merely states that "[c]ounter-defendants owe to counter-plaintiffs the sum of $300,000 due by open account and account stated." This clearly fails to state a claim for relief under an account-stated theory under Illinois law, for myriad reasons, including the fact that the Disctronics Group did not allege that Quixote had agreed that the amount was due and payable. Count VII is merely a disguised breach of contract claim, which is not needed, because the Disctronics Group can obtain such relief under Count VI of its counterclaim. The dismissal of Count VII of the defendants' counterclaim complaint was, therefore, proper. *Page 1165 
In Count XI, the Disctronics Group sought to join a claim against a former member of the DMI board of directors who was placed on that board by Quixote while Quixote was a minority shareholder in DMI. Count XI alleged:
 "During the tenure of [the DMI director] an opportunity for a joint venture between DMI and Dianippon Ink Chemical Company was presented to [the director] for the development of CD Roms.
 "Said opportunity belonged to DMI, but Quixote and [the director] seized it for Quixote and denied the same to DMI. [The director] and Quixote conspired to avoid presenting said opportunity to DMI.
 "The loss of said opportunity lessened the ability of DMI to refinance its debt and thus resulted in the counter-plaintiffs' losing their investment in DMI."
(Emphasis added.) Count XI was correctly dismissed, because the Disctronics Group, as a former stockholder of DMI, was impermissibly attempting to bring a direct action based upon a wrong allegedly suffered by DMI. Only through a derivative action can a stockholder seek redress for injury to the corporation in which he owns stock; the Disctronics Group did not seek to pursue a derivative action. Count XI, therefore, fails to state a claim upon which relief may be granted.
In Count IX of the counterclaim, the Disctronics Group alleged that the plaintiffs' continued use of certain trademarks and tradenames that had been used by DMI while it was part of the Disctronics Group is wrongful and constitutes "palming off" under Alabama's common law. The parties agree that Alabama law governs this claim, because DMI's principal place of business was in Alabama. There is no question that Alabama law provides a remedy for "palming off."[4] Because Count IX of the Disctronics Group's counterclaim "sufficiently pleaded facts that if proven would entitle [the Disctronics Group] to recover," Anonymous, 672 So.2d at 790, under Alabama unfair competition law, the dismissal of this count cannot be justified under Rule 12(b)(6), Ala. R. Civ.; therefore, as to this count the order of dismissal is due to be reversed.
Quixote and Disc Manufacturing, Inc., also argued to the trial court that they were entitled to a summary judgment as to Counts I (breach of the implied covenant of good faith and fair dealing), II (economic duress), IV (unjust enrichment), and XI (breach of fiduciary duty), because, they claimed, those claims were subject to a release. Because we hold that the trial court could have properly based the dismissal of Counts I, II, IV, and XI solely upon Rule 12(b)(6), Ala. R. Civ. P., we need not address whether any of those claims had been contractually released.
 III.
We have considered the parties' other allegations of trial court error and conclude that the trial judge did not err in those respects.
1941401 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1941451 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1941559 REVERSED AND REMANDED.
1941623 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOOPER, C.J., and MADDOX, ALMON, SHORES, KENNEDY, INGRAM, and BUTTS, JJ., concur.
[1] The 1989 Work-Out Agreement clearly changed the nature of the relationship of the parties to the present dispute. As of the date of the agreement, DMI was no longer the wholly owned subsidiary of the Disctronics Group, because the Work-Out Agreement clearly shifted a 49% interest in the voting stock of DMI to Quixote Corporation, along with 12% of DMI's preferred nonvoting stock, making Quixote Corporation a minority shareholder in DMI. Although the Disctronics Group defendants argue otherwise, that agreement extinguished the prior debtor-creditor relationship, transforming the debt owed to Quixote Corporation into equity in DMI and LVAC.
[2] Delaware law is the law applicable to the plaintiffs' breach of fiduciary duty claims, because "[t]he established rule of conflicts law is that 'the internal corporate relationship is governed by the law of the state of incorporation.' " Massey v.Disc Mfg., Inc., 601 So.2d 449, 454 (Ala. 1992) (quoting P. John Kozyris, Corporate War and Choice of Law, 1985 Duke L.J. 1, 15).
[3] Even if the Agreed Final Order were considered to be a final judgment under Illinois law, it is highly questionable that the Full Faith and Credit clause would require Alabama courts to decline jurisdiction in this case even given the inclusion of the exclusive jurisdiction provision in question. According to the leading authorities, orders attempting to localize a dispute to one jurisdiction's courts are not always entitled to full faith and credit:
 "Sometimes an injunction is granted restraining parties from maintaining a particular action in another state. If the ground on which the injunction is based be fraud in the transaction sued upon, or some other fact going to the existence of the cause of action, it amounts to a decision on the merits and bars a later suit. But if the injunction be granted because of the inconvenience of an action being brought away from the place where the cause of action arose and the parties and witnesses reside, or for similar reasons of the forum non conveniens type, it is not based on the substantive merits of the cause of action, and is no bar to the maintenance of the . . . extrastate action, even though the court in which the action is pending may voluntarily respect the order if it wishes to do so. The injunction is directed against parties, not against the second court."
Robert A. Leflar et al., American Conflicts Law, § 83, p. 246 (4th ed. 1986).
Furthermore, "[a] judgment rendered in one State of the United States need not be recognized or enforced in a sister State if such recognition or enforcement is not required by the national policy of full faith and credit because it would involve an improper interference with important interests of the sister State." Restatement (Second) of Conflict of Laws, § 103 (1971).
[4] See, e.g., Jefferson Home Furniture Co. v. Jefferson FurnitureCo., 349 So.2d 5, 8 (Ala. 1977), which states:
 "Unfair competition generally consists of 'palming off' on customers, who are buying with ordinary care, the goods or business of one person as and for the goods or business of another. Empire Guano Co. v. Jefferson Fertilizer Co., 201 Ala. 277, 78 So. 53 (1917). . . ." *Page 1166